**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

EDSON R. ARNEAULT, *et al.,*     )
     )
     Plaintiffs,     )     Case No.  1:11-cv-95-SJM
     v.     )
     )
KEVIN T. O'TOOLE, *et al.,*     )
     )
     Defendants.     )

## <u>MEMORANDUM OPINION</u>

McLAUGHLIN, SEAN J., District J.,

This civil action arises out of events surrounding the creation and operation of a gaming facility located in Erie County and known as Presque Isle Downs. The Plaintiffs are Edson R. Arneault, an accountant and businessman experienced in the gaming industry, Gregory J. Rubino, a real estate agent and developer in Erie County, Pennsylvania, and Passport Realty, LLC ("Passport Realty"), a limited liability company organized under the laws of Pennsylvania whose day-to-day operations are handled by Rubino. Passport Realty is the successor in interest to Tecnica Development Corp. ("Tecnica"), a real estate development company formed by Rubino.

Named as Defendants are numerous individuals and/or corporate entities which can be delineated into the following groups. The first includes Kevin F. O'Toole, the Executive Director of the Pennsylvania Gaming Control Board ("PGCB") and R. Douglas Sherman, the PGCB's Chief Counsel. Plaintiffs refer to these individuals collectively as the "PGCB Employee Defendants," and this Court will as well.

1

The second group of Defendants consists of eight present and former members of the Pennsylvania Gaming Control Board of Commissioners (collectively, the "Board") – namely, Gregory C. Fajt, Raymond S. Angeli, Jeffrey W. Coy, James B. Ginty, Kenneth T. McCabe, Gary A. Sojka, Kenneth I. Trujillo, and Sanford Rivers. At times, these individuals will be referred to as the "Commissioner Defendants."

The third group of Defendants includes E. Barry Creany (Deputy Chief Enforcement Counsel for the PGCB), Philip J. Rendin (Regional Director of the PGCB's Western Regional Office), Thomas J. Brletic (a Supervisor in the Western Regional Office of PGCB's Bureau of Investigation and Enforcement ("BIE")), Gary Tallent (an agent in the BIE's Western Regional Office), and David Smith (also an agent in the BIE's Western Regional Office). This group of individuals will be collectively referred to as the "BIE Defendants."

The fourth group of Defendants includes MTR Gaming Group, Inc. ("MTR"), its wholly-owned subsidiary Presque Isle Downs, Inc. ("PIDI"), James v. Stanton (a director of MTR who has also served as a member of MTR's Audit, Succession, Compensation, Nominating and Gaming Compliance Committees), John Bittner (Chief Financial Officer of MTR), Narciso Rodriguez-Cayro (Secretary of MTR and also its Vice President of Regulatory Affairs and General Counsel), and Vincent Azzarello (at relevant times, the Human Resources Manager for MTR as well as a compliance officer and member of MTR's Gaming Compliance Committee). This group of Defendants will be collectively referred to as the "MTR Defendants."

The other remaining Defendants are Robert Griffin (the past President and CEO of MTR from approximately September 26, 2008 until September 30, 2010), David

2

Hughes (a former Chief Financial Officer and/or administrator of MTR), Leonard

Ambrose (an attorney licensed to practice law in Pennsylvania), and, finally, Nicholas C.

Scott and Scott's Bayfront Development, Inc. (collectively, the "Scott Defendants").

Each of the foregoing groups of Defendants have filed motions to dismiss, in

whole or in part, the Plaintiff's Amended Complaint (Doc. #50), which is the operative

pleading in this case.  For the reasons set forth below, this Court will dismiss Plaintiffs'

federal claims with prejudice and will dismiss the remaining state law claims without

prejudice to be reasserted in state court.[1]

## I.  BACKGROUND

This action was commenced on April 15, 2011 when the Plaintiffs filed their

complaint in federal district court.  The Amended Complaint ("AC") is quite lengthy,

consisting of some 147 pages and 469 paragraphs.  Because we are writing primarily

for the benefit of the parties, who are well-acquainted with the allegations in the

Amended Complaint, we will not recite all of the averments in that pleading except as

necessary to address the pending motions.  Instead, we will summarize the gist of

Plaintiff's allegations as well as their various claims.

Defendant MTR, formerly known as Mountaineer Park, is a corporation organized

under the laws of Delaware and located in West Virginia.  (AC ¶ 25, 39, 41.)  From 1995

through October 31, 2008, Arneault served as CEO of MTR, during which time the

company's revenues grew from $24.9 million to $407 million and expanded its

operations in six states.  (AC ¶ 42.)  PIDI is a Pennsylvania corporation physically

---

[1] This Court has subject matter jurisdiction over the action pursuant to 28 U.S.C. §§ 1331, 1343, and 1367.

located in Summit Township, Erie County, Pennsylvania. (Id. at ¶ 26.) PIDI is a wholly-owned subsidary of MTR. (Id.)

The allegations in this case arise out of efforts by MTR and PIDI to develop a racetrack and casino in Erie, Pennsylvania, known as the Presque Isle Downs. In early 2001 MTR (through Arneault) and Tecnica (through Rubino) met to discuss the prospects of horse racing and gaming in the Erie market. At that time, Tecnica was a company that provided real estate development and consulting services. (AC ¶ 56.)

As a result of these discussions, MTR and Tecnica entered into a consulting agreement, pursuant to which Tecnica was responsible for all development activity including the acquisition of land, development, zoning and environmental permits, and the coordination of all other professionals involved in the development of a racetrack (and, ultimately, a casino) in Erie County. (AC ¶ 57.) In May of 2002, the consulting agreement was amended to include the acquisition of other potential sites and to add PIDI as a party. (Id. at ¶ 58.) This agreement provided compensation to Tecnica in the amount of an initial $50,000 fee, an additional $250,000 fee when property for the racetrack was acquired, and a $10,000 per month retainer while work was ongoing. In addition, once the race track opened, Tecnica was to earn a fee equal to 3% of the racetrack's earnings. (Id. at 59.)

On December 28, 2005, MTR and PIDI applied to the PGCB for a Category 1 Gaming License. (AC ¶ 62.) Thereafter, Tecnica and Rubino were notified by representatives of MTR and PIDI that both Tecnica and Rubino would need to file applications for licensure with the PGCB because of the fact that Tecnica had a financial interest in PIDI's gaming profits. (Id. at ¶ 66.)

4

On March 7, 2006, Rubino's counsel wrote to Lisa McClain of the PGCB, stating his view that neither Rubino nor Tecnica were required to register with the PGCB or submit any filing under the Gaming Control Act and applicable regulations. This letter also asked that PGCB confirm its agreement with the position outlined by Rubino's counsel. (AC ¶ 67.)

By letter dated March 21, 2006, Susan Hensel, the Director of the PGCB's Bureau of Licensing, refused to "provide such confirmation" and reiterated the PGCB's position that both Rubino and his wife, along with Tecnica, needed to either file Key Employee Qualifier forms, terminate Tecnica's consulting agreement with MTR and PIDI, or seek a waiver or declaratory judgment that they were not required to be licensed. (AC ¶ 68.) In this letter, Hensel materially miscalculated Rubino's potential proceeds from the consulting agreement and further indicated that PIDI's license application would be delayed in the event Rubino (or his wife) were to seek a waiver or petition the PGCB for a declaratory determination that their own licensure was not required. Hensel concluded her letter with a request that Rubino direct his future communications through the attorneys for PIDI. (Id.)

Despite their view that neither the Gaming Act nor the applicable administrative regulations required them to do so, Tecnica and Rubino filed Key Employee Qualifier Waiver forms on June 1, 2006, allegedly under "duress" and with the intent of expediting PIDI's licensure. (AC ¶ 70.) Despite this, the PGCB informed counsel for MTR/PIDI, via letter dated July 7, 2006, that Rubino and his wife were required to submit Key Employee Qualifier forms and Multi-Jurisdictional Applications and that Tecnica would have to submit a Conditional/ Category 1 Application as an affiliate of PIDI. (Id. at ¶ 71.)

5

Further, these documents were required to be submitted no later than July 14, 2006 in order to "ensure continued processing" of PIDI's license application – a task that Plaintiffs allege was "onerous, practically impossible to complete in seven days, and without precedent for a [realtor] in Mr. Rubino's situation." (Id.) Rubino and Tecnica filed the requested forms in late July or early August 2006, despite their belief that no legal or logical basis existed for the imposition of this requirement. (Id. at ¶¶ 73-74.)

Approximately two months later, Arneault contacted Rubino to inform him that PGCB was forcing MTR/PIDI to terminate its consulting agreement with Tecnica. (AC ¶ 75.) Under what Rubino claims was "extreme duress," (id. at ¶ 79), he agreed to terminate the consulting agreement because he understood that a refusal to do so would result in further delays in the approval of PIDI's slot machine license and this, in turn, would cause PIDI to lose tens of millions of dollars and potentially affect the employment of some 700 individuals. (AC ¶¶ 75, 79.) The result was a "buyout" agreement dated October 23, 2006, pursuant to which Rubino and Tecnica received a payment of $4.2 million – a sum which Rubino claims is $12.7 million *less* than he stood to make under the consulting agreement. (Id. at ¶¶ 79, 81.)

In executing the buyout agreement, Rubino believed he would still be able to engage in other business matters with MTR in Erie and elsewhere. (AC ¶¶ 85-86.) However, Rubino was subsequently informed by MTR/PIDI that the PGCB was taking a contrary position, requiring MTR and PIDI from doing *any* business with Tecnica or Rubino. (AC ¶ 84.)

On November 7, 2006, the PGCB unanimously approved PIDI's application for a Conditional/Category 1 License to build its facility in Summit Township and, on February

6

27, 2007, the PGCB unanimously voted to allow PIDI to commence operations.  (AC ¶¶ 87-88.)  Some six months later, on August 20, 2007, PIDI was required by the PGCB to execute a mandatory "Statement of Conditions to its Category 1 Slot Operator License" ("SOC"), which included the following provision, known as "SOC 58":

> To ensure at all times after December 20, 2006, that MTR Gaming Group, Inc. and its affiliates, including Presque Isle Downs, Inc., not enter into or engage in any business activity or transaction with Gregory Rubino or any of his affiliates in the Commonwealth of Pennsylvania (except with respect to the arrangements concerning the Green Shingle Property as set forth in the October 23, 2006 buyout Agreement entered among Presque Isle Downs, Inc., MTR Gaming Group, Inc., and Tecnica Development Corp.)

(AC ¶ 89.)

In early January of 2008, MTR and PIDI filed a petition with the PGCB to amend and/or strike SOC 58.  (AC ¶ 138.)  However, after Defendant Creany, Deputy Chief Enforcement Counsel for the PGCB's Office of Enforcement Counsel ("OEC"), informed MTR and PIDI that Rubino would be the appropriate party to seek relief form SOC 58, MTR and PIDI withdrew their petition.  (Id. at ¶ 139.)

Rubino and Passport Realty then filed a petition seeking relief from SOC 58 on February 13, 2008.  (AC ¶140.)  The petition sought a declaration that Rubino and Passport were exempt from vendor certification and/or registration and that there was no valid reason for the existence of the ban.  The petition further sought permission for Rubino and Passport to provide professional real estate services to PIDI with regard to two proposed transactions which would have resulted in commissions of $900,000 and $1,000,000 to Passport and Rubino.  (AC ¶ 141.)  The transactions contemplated the sale of excess, non-productive properties which were not strategic to MTR's or PIDI's

businesses, including a property known as the Green Shingle, which had been neglected and was falling into disrepair. (Id. at ¶¶ 142-43.)

On March 4, 2008 Creany filed an answer to Rubino's petition wherein, in direct contravention to his previous statements to MTR and PIDI, Creany now took the position that Rubino lacked standing to seek relief from SOC 58. (AC ¶ 144.) The hearing officer disagreed and found that Rubino did have standing to assert his challenge to SOC 58. The hearing officer further found that PIDI should be joined in the matter, since the terms of its gaming license were at issue. (AC ¶ 145.)

A hearing on Rubino's petition was subsequently held on November 25, 2008. Plaintiffs claim that, at this hearing, Rubino provided undisputed testimony concerning his unique knowledge of the two PIDI properties and why he was the real estate agent best suited to facilitate the sale of those properties. (AC ¶ 146.) Although PIDI's counsel – including Defendant Rodriguez-Cayro – were present throughout the hearing, they failed to offer any support or affirmation of Rubino relative to his petition when given the opportunity to do so. (Id. at ¶147.)

On February 13, 2009, Hearing Officer Linda Lloyd issued a Report and Recommendation in which she recommended that the Board of Commissioners deny the relief requested by Rubino. (AC ¶ 148.) This recommendation was based, in part, on Ms. Lloyd's finding that counsel for MTR/PIDI (Defendant Rodriguez-Cayro and Attorney Robert Ruben), by their silence, did not support any change to SOC 58. (Id.) In fact, it is alleged, MTR and PIDI had previously confirmed their support of Rubino and the removal of SOC 58 in writing on numerous prior occasions. (Id.)

8

During the pendency of this matter, Rubino was contacted by a prospective buyer for the Green Shingle property, but he was unable to formulate a proposal solely because of the confusion created by SOC 58.  (AC ¶ 149.)  On June 11, 2009, Rubino's attorney wrote the OEC's Chief Enforcement Counsel, Cyrus Pitre, as well as Defendant Creany to request the PGCB grant a limited exception to SOC 58 allowing Rubino to represent this potential buyer.  (Id. at ¶ 150.)  The correspondence emphasized that time was of the essence and that neither Rubino nor Passport Realty "would have any influence on PIDI's gaming or business operations, nor would they be employed or compensated by PIDI."  (Id.)  This letter was followed by numerous phone calls to Chief Enforcement Counsel Pitre, who assured Rubino's lawyer that Creany would get back to him.  On or around July 8, 2009, Creany left a voicemail for Rubino's attorney in which he refused to assent to Rubino's representation of potential buyers of PIDI properties and stated that, in the event Rubino was seeking relief from the PGCB relative to SOC 58, Rubino "would need to file for specific relief with the Board."  (AC ¶ 151.)

Meanwhile, Rubino had appealed Hearing Officer Lloyd's R&R to the Board, and a vote on the matter was scheduled for September 2, 2009.  Just hours before the scheduled hearing and vote, the PGCB Commissioners unilaterally decided to change the agenda and remove the matter from consideration.  (AC ¶ 152.)  Rather than conduct the hearing as scheduled and proceed to a vote on Rubino's petition for relief, the Commissioners met privately and voted to hold their decision in "abeyance" pending the submission by Rubino and Passport Realty of new vendor licensing applications sponsored by MTR and PIDI.  (Id. at ¶¶ 153-54.)

According to the Plaintiffs, this "abeyance" ruling intentionally placed Rubino in an impossible "catch-22" situation because, as the PGCB and its Commissioners well knew, great animosity had developed between Rubino and the MTR/PIDI Defendants such that the latter would never sponsor an application by Rubino and/or Passport Realty for new vendor licenses. (Id. at ¶¶ 154-55.) Plaintiffs claim that this "catch 22" situation was intentionally created by the PGCB Commissioners in order to keep Rubino and his company from being able to submit the required licensing applications. (Id.)

Plaintiffs further aver that this "abeyance" has continued for over 21 months and continued even as of the filing of the Amended Complaint. (AC ¶ 154.) They contend that PGCB's ban on Rubino doing business with MTR and PIDI has been widely reported by various media outlets and those reports have been disseminated over the internet, thus casting Rubino (and, by extension, Arneault) in an unfavorable light, damaging their personal and business reputations, and resulting in lost business opportunities. (AC ¶¶ 160-61.)

Plaintiffs claim that the PGCB has repeatedly refused to allow Rubino and/or his attorney an opportunity to review the Board's files on Rubino and Tecnica. (AC ¶¶156-57.) Further, the PGCB has never informed Rubino as to why SOC 58 was originally imposed, why it remained in place, or how the integrity of the gaming industry is protected by that condition. (ID. at ¶ 158.)

Despite this, Plaintiffs claim that the real reason Rubino and his companies have been forced out of the consulting agreement and precluded from doing any business with MTR or PIDI is because of false information supplied to the PGCB's Bureau of Investigation and Enforcement ("BIE") by Defendant Ambrose. Specifically, Plaintiffs

allege that Ambrose had a long-standing vendetta against Rubino and that Ambrose --

aware of SOC 58, its negative and punitive effects on Rubino, and Rubino's

determination to have the restrictions of SOC 58 stricken – met with Defendant Brletic

(a supervisor in the BIE) and Defendant Tallent (a BIE agent) on several occasions in

July or August 2006, at which time Ambrose supplied these individuals with false and

derogatory information about Rubino.  (AC ¶¶ 116-18.)

In particular, Ambrose allegedly informed Brletic and Tallent that Rubino was a

member of the mafia and was protected from arrest because of his ongoing role as a

confidential informant – information which Rubino denies as untrue.  (Id. at ¶¶ 119-20.)

It is averred that Brletic then improperly relied upon the misinformation supplied by

Ambrose to reach unfounded conclusions about Rubino in a November 18, 2008

memorandum entitled "Presque Isle Downs, Inc., Unresolved Issues and Concerns" as

well as a May 21, 2010 Report of Investigation.  (Id. at ¶¶ 121.)  Among the false

conclusions reached by Brletic are the following:  (a) Rubino compromised an ongoing

FBI drug investigation by tipping off a target of the probe, after agreeing to cooperate in

order to avoid arrest; (b) Rubino was an unindicted co-conspirator in a large drug

investigation in the 1980s; (c) Rubino was an FBI informant on at least six occasions;

(d) Rubino lied to BIE regarding the employment of and money paid to a Las Vegas

gaming executive by the name of "Charlie Sack"; and (e ) Rubino lied to the BIE

regarding circumstances surrounding the Green Shingle property.  (Id. at ¶ 122, 182.)

According to Plaintiffs, these conclusions are irreconcilable with a statement made by

then-PGCB Chairman Tad Decker in October of 2006 to the effect that there was "'no

indication of any kind of background unsuitability' on the part of Tecnica or Rubino."

(AC ¶ 125.)  Plaintiffs contend that one of the reasons Rubino was forced out of his consulting agreement with MTR and PIDI was because Defendants Brletic, Tallent, Rendin, and possibly Rivers "intentionally and knowingly relied upon false and negative information provided by Defendant Ambrose" and "reached an understanding" to force Rubino out of business with MTR and PIDI for reasons unrelated to protecting the integrity of gaming.  (Id. at ¶ 126.)

Meanwhile, Arneault and MTR were having their own issues with the PGCB.  In November of 2006, while Arneault was still CEO of MTR, Defendant Tallent requested from MTR the creation of a report, in electronic searchable form, detailing payments made to any vendor of goods or services, as well as employees, contractors, etc. for the years 2000-2005 and through October 31 of 2006.  (AC ¶ 127.)  In his letter requesting this information, Tallent claimed that the report was "necessary" as part of an "ongoing analysis regarding the financial status of [MTR]."  According to Plaintiffs, this statement was false because:  (i) the PGCB had already approved PIDI and MTR for a Conditional Category 1 License during a public hearing held the month before; and (ii) during the hearing, the PGCB's then-Director of Finance, Denyse Miskin, had publically detailed the Financial Task Force evaluation and had reported to the PGCB that MTR and PIDI were financially suitable.  (AC ¶ 128.)  When counsel for MTR/PIDI inquired of Miskin if a less burdensome report than that requested by Tallent would satisfy the Financial Task Force's needs, Miskin responded that the investigation of MTR's and PIDI's financial status had been completed, that she was not aware of Tallent's request for information, and that the request was neither made by nor authorized by the Financial Task Force.  The following day, Tallent's request was formally withdrawn.  (AC ¶ 129.)

Subsequently, on May 25, 2007, counsel for MTR and PIDI met with members of the PGCB's executive staff, which included Creany as well as a number of individual not named as Defendants in this lawsuit. (AC ¶ 130.) The purpose of this meeting was to discuss the future relationship between MTR/PIDI and the regulators at PGCB in light of two prior incidents involving Creany. (Id. at ¶¶ 130-31.) The first incident had involved a subpoena served upon MTR/PIDI by Creany ostensibly for the purpose of conducting a personal background investigation of PIDI's interim Director of Security, who was scheduled to remain at PIDI only for another month. (Id. at ¶ 131.) The subpoena did not request a single document related to the interim Director of Security's background, experience or qualifications for the position, but instead requested hundreds of documents including all incident reports generated by the security department from its inception, personnel files of all sixteen security guards, and all reports of personal counseling sessions between management and employees of PIDI. (Id.) The second incident had involved a threat by Creany to bring two formal enforcement actions against PIDI over minor technical violations which had been self-reported and corrected. (Id.)

During the May 25, 2007 meeting, PGCB officials stated that PIDI continued to be a model of casino operations and that there were no incidents warranting enforcement actions. PGCB officials further indicated that BIE agents had been instructed that the investigation phase had closed and that BIE agents were in the enforcement phase. According to Plaintiffs, PGCB officials also made clear that PIDI would no longer be the subject of BIE subpoenas and that there would be no more

clandestine inquiries into the backgrounds of individuals who had already received Key Employee Qualifier clearance.  (AC ¶ 132.)

Despite these assurances, Plaintiffs claim, various Government Defendants have continued to engage in intimidation and coercive conduct.  (AC ¶ 133.)  Plaintiffs claim, for example, that on July 26, 2007, Defendants Tallent, Brletic, and Smith interviewed a prospective PIDI vendor by the name of Gregory Beight.  During this interview, it is alleged, the BIE agents falsely accused Arneault of violating federal and state election laws by surreptitiously funneling money to political candidates, and they tried to intimidate Beight into providing false testimony about Arneault and other individuals related to MTR/PIDI in exchange for approving Beight's vendor certification.  (Id.)

Counsel for MTR and PIDI responded to this incident by writing a letter to the Chairman and Executive Director of the PGCB on September 25, 2007 complaining of the "actionable tortuous conduct as well as possible criminal conduct" on the part of the BIE agents.  (AC ¶ 134.)  Subsequently, on April 29, 2008, David J. Kwait, Director of the BIE, wrote to Mr. Beight and apologized for the agents' actions.  In that same letter, Kwait represented that he had undertaken a "thorough review of all of the relevant information and resources available to the BIE" and had concluded that "BIE has no actionable information that would support the allegations that were made against Messrs. Arneault, Ruben and Blatt."  (AC ¶¶ 135-36.)  Kwait further acknowledged that he had "no reason to question the good character, honesty and integrity required of Messrs. Arneault and Blatt as licensed principals…"  (Id. at ¶ 136.)

Arneault's primary complaint against the Government Defendants, however, concerns various actions taken by the PGCB and the BIE Defendants in connection with

14

Arneault's attempt to renew his gaming license. As of April 2008, Arneault was still serving as CEO of MTR and Chairman of its Board of Directors. Accordingly, on April 21, 2008, he filed an application to renew his Category 1 Gaming License as an officer, director and principal shareholder of MTR – a license which had originally been approved by the PGCB on June 10, 2007. (AC ¶¶ 171-73.)

As of October 31, 2008, however, Arneault had voluntarily retired as an officer, director or employee of MTR. He continued to serve as a consultant to MTR from November 1, 2008 until February 17, 2010 (AC ¶¶ 174-75), but by March of 2010, Arneault was no longer serving as a consultant to MTR and his stock ownership in the Company had fallen to less than 5 percent of MTR's total outstanding shares. (Id. at ¶ 175.)

Nevertheless, the PGCB continued to treat Arneault as a "principal" of PIDI with respect to licensing matters. After PIDI had filed an application to renew its gaming license on December 29, 2008, the PGCB continued to require that Arneault also maintain his license as a "principal" of PIDI. (AC ¶¶ 173, 176, 288.)

Meanwhile, after Arneault had filed his application for license renewal in April of 2008, the Western Regional Office of the BIE ("BIE-West") prepared a Report of Investigation ("ROI") dated May 21, 2008 in which, Plaintiffs claim, BIE-West "intentionally and improperly found falsehoods to contest the suitability of Mr. Arneault to be renewed for licensure and to recommend the denial of Mr. Arneault's Principal license renewal." (AC ¶ 178.)

One of these alleged falsehoods involved the accusation that Arneault had provided false and misleading information to the BIE concerning Charlie Sack, a Las

15

Vegas gaming executive who had had prior legitimate business dealings with both MTR and Tecnica.  (AC ¶¶ 182-84, 186.)  Plaintiffs claim that, after their business relationships with Sack ended, Sack began an "unrelenting campaign with the PGCB to get even" with Plaintiffs.  (AC ¶185.)  This resulted in Sack providing Brletic false information that MTR and PIDI had used Tecnica as a conduit to funnel illegal payments to Sack.  (Id.)  According to Plaintiffs, the BIE – and particularly Brletic – had information indicating that Sack lacked credibility and should not be relied upon as a witness, and Brletic also had received unverified information that Sack might have ties to organized crime.  (AC ¶¶ 187-89.)  Nevertheless, Plaintiffs claim, Sack and Brletic had an understanding whereby "Sack would tell the story about Arneault and Rubino that the PGCB wanted to hear, and Defendant Brletic would reciprocate by placing Sack in a high-profile executive position with another PGCB licensee…"  (AC ¶ 190.)

Also contributing to these false allegations, Plaintiffs allege, was information unlawfully obtained and provided to the BIE agents by Defendant Ambrose.  According to Plaintiffs, Ambrose came into possession of certain proprietary information that had been misappropriated from Tecnica and Rubino via a former employee.  This included records from Tecnica and Rubino that accounted for legitimate payments to Sack as well as various legal and contractual payments from MTR and PIDI to Tecnica for real estate development and management services rendered.  (AC ¶¶ 192-93; *see also id*. at ¶¶ 94-117.)

Plaintiffs aver that, based upon various misrepresentations made by Sack, Ambrose, and others, and without any independent verification or consultation with Plaintiffs, BIE adopted the view that the payments from MTR to Tecnica were a sham

16

intended to cover up a continuing illicit relationship between MTR and Sack and that Arneault had given perjured statements concerning these payments. (AC ¶ 194.) Plaintiffs insist there was no legitimate reason for the Government Defendants to question MTR's and Tecnica's respective relationships with Sack because: (i) Sack's relationship with those companies had expired prior to the enactment of the Pennsylvania Race Horse Development Act; (ii) Sack's relationship with MTR and Tecnica were legal and commercially reasonable in all respects; and (iii) Sack's relationships with MTR and Tecnica had previously been reviewed and approved by the Nevada Gaming Commission. (AC ¶ 195.)

Nonetheless, based upon the information contained in BIE-West's ROI, the PGCB's Office of Enforcement Counsel issued a notice of recommendation that Arneault's license renewal application be denied (the "Recommendation of Denial"). (AC ¶ 179.) This Recommendation of Denial, dated January 22, 2010, declared that "the BIE background investigation revealed inaccuracies or inconsistencies between the statements [Arneault] made to investigators and the Board which called into question [his] character, honesty and integrity." (AC ¶ 180.) The Recommendation of Denial indicated twelve "areas of concern" relative to Arneault's suitability for licensure. (Id.)

Arneault subsequently requested a hearing on the Recommendation of Denial, and a hearing date was set for May 20, 2010. (AC ¶¶ 196, 213.) On or about February 1, 2010, Arneault's attorney in the licensing matter contacted Defendant Rodriguez-Cayro and requested that MTR provide him certain information related to the matters at issue in Arneault's appeal of the Recommendation of Denial. (AC ¶ 197.)

Thereafter, Plaintiffs allege, and for a period of several months leading right up to the May 2010 licensing hearing, Defendant Rodriguez-Cayro delayed and stonewalled Arneault in his attempts to obtain documents and depositions of MTR employees that were relevant to his licensing hearing.  (AC ¶¶198-221.)  To the extent Rodriguez-Cayro did provide documentation to Arneault's counsel, he made clear that copies would also be shared with the opposing counsel at the OEC.  (AC ¶ 204.)  Plaintiffs claim that Arneault ultimately had to obtain the vast majority of relevant documentation from Rubino and his companies at great effort and expense to Arneault.  (Id. at ¶¶ 222-27, 230-34.)  They further assert that most, if not all, of the documents provided by Tecnica and Rubino were in the care, custody, and control of MTR/PIDI and Defendants Griffin, Hughes, Bittner, Azzarello, Rodriguez-Cayro, and MTR's legal counsel, but these documents were intentionally withheld from Arneault.  (Id. at ¶ 228.)

Eventually, hearings on Arneault's appeal of the Recommendation of Denial were held on May 20, 21, 24, 25, and 26 of 2010.  (AC ¶ 235.)  According to the Amended Complaint, Arneault demonstrated in the course of those hearings that certain BIE-West agents had intentionally failed to conduct a fair and impartial investigation of his suitability for licensure and, in fact, had conducted a biased and unfair investigation resulting in the unsupportable recommendation that Arneault be stripped of his gaming license.  (Id. at ¶ 236.)  Plaintiffs aver that, during the course of the hearings, Chief Enforcement Counsel Pitre and "certain other Government defendants" concluded that BIE-West had intentionally and improperly targeted Arneault, principally through the Recommendation of Denial and reports authored by Brletic.  (Id. at ¶ 237.)  Pitre thus sought to bring the licensing hearing to an immediate conclusion that would avoid

publication of the BIE agents' wrongful conduct by initiating a settlement conference with Arneault's counsel and Defendants O'Toole and Sherman. (AC ¶ 238.)

At the ensuing settlement conference, the OEC agreed to settle the matter on the following terms: (a) Arneault's counsel would depose Brletic; (b) immediately thereafter, and without regard to the outcome of that deposition, OEC would recommend to the Bureau of Licensing that Arneault's gaming license be immediately renewed; and (c) the OEC would also recommend to the PGCB that SOC 58 be terminated. (AC ¶ 239.) The first two conditions were fulfilled and, to that end, Pitre authored a letter dated September 14, 2010 in which he stated that Arneault had proved "by clear and convincing evidence" that his associations in gaming were proper and appropriate. (Id. ¶¶ 240-41.) Furthermore, Pitre's correspondence stated that Arneault had "established, by clear and convincing evidence, [his] good character, honesty, and integrity in order to be found suitable for licensure under the Act." (Id. at ¶ 242.) Arneault's license application was subsequently approved by a unanimous vote of the PGCB on November 18, 2010. (Id. at ¶ 243.)

On the other hand, Plaintiffs claim, Pitre and the OEC failed to perform the third condition of settlement – namely to recommend to the Board that it terminate SOC 58. (AC ¶ 244.) Moreover, the PGCB officials engaged in what Plaintiffs consider "yet another unconscionable act" by attempting, after Arneault's gaming license had already been renewed, to unilaterally impose upon Arneault certain measures in the form of a newly-requested Statement of Conditions. (AC ¶ 245.) These new "SOCs" basically sought from Arneault an agreement to reimburse the Board for all costs and/or to hold the Board and other parties harmless for any liabilities incurred in connection with

19

Arneault's licensing proceedings – actions which Plaintiffs construe as an attempt to disenfranchise Arneault of his right to petition the government for redress and recover his legal costs.  (Id. at ¶¶ 245-46.)

Meanwhile, Plaintiffs contend, news of the January 22, 2010 Recommendation of Denial has been widely reported by various media outlets and distributed over the internet, causing damage to Arneault's reputation as well as lost business opportunities in the gaming industry.  (AC ¶¶ 248-51.)

The Amended Complaint alleges that the MTR Defendants were complicit in the Government Defendants' decision to recommend the denial of Arneault's application for licensure renewal.  In broad brush, Plaintiffs aver that Arneault had a falling out with MTR as a result of several developments.  One factor, they allege, was the effort of Defendants Hughes (MTR's Chief Financial Officer) and Defendant Azzarello (MTR's Human Resource Director) to purge MTR employees that were perceived as being loyal to Arneault following his departure from the company.  (AC ¶¶ 254-55.)  Another factor, Plaintiffs claim, was the cumulative effect of Defendant Ambrose's campaign against Arneault and Rubino, which stemmed from collateral matters and which resulted in a "tectonic shift" in the way certain MTR Board members, attorneys, and PGCB staff members viewed Arneault.  (Id. at ¶ 256.)  Plaintiffs claim that this shift in attitude on the part of MTR is demonstrated by the way the company failed to honor the terms of its deferred compensation agreement with Arneault.  (Id. at ¶¶ 257-61.)

Plaintiffs also posit another motive for MTR's alleged conspiratorial activities: after rumors began to circulate sometime in 2009 that Arneault might be plotting a return to an active role in the company, Defendants Griffin, Hughes, Azzarello, and

Rodriguez-Cayro became particularly motivated to prevent Arneault's return because they knew Arneault would not tolerate their practice of submitting incomplete and misleading financial disclosures to the investing public and regulators. (Id. at ¶¶ 263-68.) According to Plaintiffs, MTR has played "fast and loose" with its reporting obligations by failing to disclose that: (i) PIDI's gaming license renewal application has been pending for some 26 months and (ii) the license renewal application has been objected to by Rubino relative to the continued pendency of SOC 58 as a condition of PIDI's gaming license. (Id. at ¶¶ 264-68, 269.) In Plaintiffs' view, MTR's post-Arneault financial disclosures "cannot be properly stated unless there is a financial disclosure relating to the genuine risk that PIDI's gaming license may not be renewed" (id. at ¶ 266 (footnote omitted)), yet the PGCB has tacitly condoned MTR's practices by failing to require the company to make these material disclosures. (Id. at ¶ 269.)

Plaintiffs aver that various officers, attorneys, agents and employees of MTR and PIDI knew that they were in custody of documentation that would undermine the false claims made by Charles Sack and demonstrate the legitimacy of the monthly $13,000 fees MTR was to pay Tecnica under the consulting agreement entered into by those companies. (AC ¶¶275-83.) Nevertheless, Plaintiffs contend, these Defendants failed to produce these documents or otherwise support Arneault against the PGCB and BIE Defendants because they wanted to curry favor with and intentionally help the Government Defendants and at the same time prevent Arneault from returning to MTR and "clean[ing] house." (AC ¶ 284.)

Based on the foregoing averments,[2] Plaintiffs have asserted ten claims. In Count 1, Arneault asserts a claim under 42 U.S.C. § 1983 against O'Toole, Sherman, and the BIE Defendants for the alleged violation of his First Amendment Rights. In Count 2, Rubino asserts a §1983 claim against Defendants O'Toole, Sherman, the BIE Defendants, and the Commissioner Defendants for the alleged violation of his First Amendment rights. In Counts 3 and 4, Arneault and Rubino respectively assert §1983 claims against these same Defendants for alleged violations of their due process rights. In Count 6,[3] Arneault and Rubino jointly assert a §1983 claim against the Commissioner Defendants based on a theory of supervisory liability for the alleged violation of the Plaintiffs' respective due process rights. In Count 7, Arneault and Rubino jointly assert a §1983 claim against Griffin, Hughes, and the MTR Defendants based upon their alleged involvement in conspiring to violate the Plaintiffs' First Amendment and due process rights. Counts 8 and 9 assert claims by Arneault and Passport Realty, respectively, against MTR and PIDI for unjust enrichment.[4] Count 10 asserts a joint §1983 claim by Arneault and Rubino against Ambrose and the Scott Defendants based upon their alleged involvement in conspiring to violate the Plaintiffs' First Amendment and due process rights. Finally, Count 11 asserts a joint claim by Arneault and Rubino against Ambrose and the Scott Defendants for alleged slander and defamation.

---

[2] Although the Amended Complaint contains numerous other factual averments, we do not view them as material to either the Plaintiffs' claims or the pending motions to dismiss. They will be discussed only to the extent necessary in order to dispose of the pending motions.

[3] In Count 5, Arneault originally asserted a claim against the BIE Defendants for alleged slander and defamation. That count, however, has since been withdrawn by the Plaintiffs.

[4] These counts originally incorporated promissory estoppel claims as well, but the latter have since been withdrawn by the Plaintiffs.

22

The Defendants have all filed motions to dismiss the foregoing claims. The pending motions have been fully briefed and argued and are now ripe for consideration.

## II. <u>STANDARD OF REVIEW</u>

Rule 12(b)(6) of the Federal rules of Civil Procedure permits a party to seek dismissal of a claim based on the defense that the averments fail to state a claim upon which relief can be granted. A Rule 12(b)(6) motion tests the sufficiency of the complaint against the pleading requirements of Fed. R. Civ. P. 8(a). Rule 8(a)(2) requires that a complaint contain a short and plain statement of the claim showing that the pleader is entitled to relief, "in order to give the defendant fair notice of what the ... claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (*quoting Conley v. Gibson*, 355 U.S. 41, 47 (1957)). A complaint attacked by a Rule 12(b)(6) motion to dismiss need not contain detailed factual allegations, but it must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, ——, 129 S. Ct. 1937, 1949 (2009) (quoting Twombly, 550 U.S. at 570)).

To survive a motion to dismiss, a civil plaintiff must allege facts that "raise a right to relief above the speculative level...." *Victaulic Co. v. Tieman*, 499 F.3d 227, 234 (3d Cir.2007) (*quoting Twombly*, 550 U.S. at 555). Accordingly, to satisfy the plausibility standard, the complaint must indicate that a defendant's liability is more than "a sheer possibility." *Iqbal*, 129 S. Ct. at 1949. "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

23

Under the two-pronged approach articulated in *Twombly* and later formalized in *Iqbal*, a district court must first identify all factual allegations that constitute nothing more than "legal conclusions" or "naked assertions." *Twombly*, 550 U.S. at 555, 557. Such allegations are "not entitled to the assumption of truth" and must be disregarded for purposes of resolving a 12(b)(6) motion to dismiss. *Iqbal*, 129 S. Ct. at 1950. Next, the district court must identify "the 'nub' of the ... complaint—the well-pleaded, nonconclusory factual allegation[s]." *Id*. Taking these allegations as true, the district judge must then determine whether the complaint states a plausible claim for relief. *See id.* In reviewing a motion to dismiss, we consider the "complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir.2010).

### III.   DISCUSSION

#### A.  Plaintiffs' Federal Claims

We first consider Plaintiffs' federal claims, which are brought pursuant to 42 U.S.C. § 1983. That statute provides a private right of action as against

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws …

42 U.S.C. § 1983.

Section 1983 does not create substantive rights; instead, it provides a remedy for the violation of federal constitutional or statutory rights. *Dique v.New Jersey State*

24

*Police*, 603 F.3d 181, 185 (3d Cir. 2010) (citation omitted).  To properly assert a claim under §1983, the plaintiff must allege facts sufficient to show (1) the violation of a right secured by the Constitution or laws of the United States and (2) that the alleged deprivation was committed by a person acting under color of state law.  *Lomax v. U.S. Senate Armed Forces Service Committee,* No. 11-3303, 2011WL 6016945 at *1 (3d Cir. Dec. 5, 2011) (citing *West v. Atkins*, 487 U.S. 42, 48 (1988)).

In addition, each Defendant's potential liability must be predicated on the basis of his or her own personal actions relative to the Plaintiffs, because liability under § 1983 cannot be premised on theories of vicarious liability or respondeat superior.  *See Iqbal*, 129 S. Ct. at 1948 (noting that, because vicarious liability is inapplicable in a § 1983 suit, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution").

Initially, then, we must determine whether Plaintiffs have pleaded facts which would establish the deprivation of a federal right.  In this case, Plaintiffs have alleged violations of their First Amendment rights to free speech and to petition the government for redress as well as their Fourteenth Amendment rights to substantive and procedural due process.  These substantive claims are set forth in Counts 1 through 4 of the Amended Complaint.  In addition, Plaintiffs have asserted a claim against the Commissioner Defendants in Count 6 based on their status as policy-makers.  In counts 7 and 10, Plaintiffs assert claims against the MTR Defendants, Griffin, Hughes, Ambrose and the Scott Defendants for allegedly conspiring with the Government Defendants relative to Counts 1 through 4.  We consider each of these claims in turn.

25

*1. Alleged Violations of Arneault's First Amendment Rights*

In Count 1 of the Amended Complaint, Arneault claims that his First Amendment rights were violated by O'Toole, Sherman, and the BIE Defendants.  To state a cognizable claim under §1983 for the violation of First Amendment rights, a plaintiff must establish three elements:  (1) that he engaged in constitutionally protected activity; (2) that he was subjected to adverse action sufficient to deter a person of ordinary firmness from exercising his constitutional rights; and (3) that there was a causal link between the plaintiff's constitutionally protected activity and the defendant's alleged adverse actions.  *Thomas v. Independence Township,* 463 F.3d 285, 296 (3d Cir. 2006).

With regard to the first prong, most of the examples Arneault cites as constitutionally protected activity cannot be properly attributed to him.  The Amended Complaint lists the following as "activities of Mr. Arneault that are protected from retaliation" (AC ¶ 351):

a.  Mr. Arneault directed counsel for MTR and PIDI to object to the November, 2006 request from Defendant Tallent that MTR create a report, in electronic searchable form, detailing payments made to any vendor of goods or services, and employees, contractors etc. for the years 2000 through October 31, 2006.

b.  At Mr. Arneault's direction, on May 25, 2007, counsel for MTR and PIDI met with members of the PGCB's executive staff … to complain about two matters involving Defendant Creany.[ ]

c.  At the direction of Mr. Arneualt [sic], by letter dated September 25, 2007, counsel for MTR and PIDI wrote to the Chairman and Executive Director of the PGCB, and complained that "agents of the Bureau of Investigations have engaged in, and continue to engage in, actionable tortuous conduct as well as possible criminal conduct" and then proceeded to outline the supporting facts. The letter warned that Mr. Arneault, and others, "have actions against the agents and perhaps the PGCB (to the extent the actions of the agents were

26

not ultra vires or resulted from improper supervision).  The Agents' concerted efforts to besmirch Arneault, MTR and PIDI, along with the baseless allegations of improper business activity by their respective officers, may also form the basis for a commercial disparagement claim against the agents and the PGCB by PIDI and MTR."

    d.  At the direction of Mr. Arneault, counsel for MTR/PIDI, of which Mr. Arneault was the chief executive officer, petitioned the PGCB for the removal of SOCs 54 and 58.

(AC ¶ 351 (a)-(d) (footnote omitted).)

With the possible exception of the third example, these allegations do not allege constitutionally protected activity on the part of Arneault.  Rather, the allegations – especially as set forth in subparagraphs (a), (b) and (d) – outline examples of speech and/or petitioning for redress that were undertaken by counsel for MTR and PIDI in his capacity as an agent of MTR/PIDI and while acting on behalf of those corporate entities. The fact that Arneault allegedly directed these communications by corporate counsel does not thereby transform counsel's statements into speech or protected petitioning that can be imputed to Arneault personally.  In fact, Plaintiffs' own allegations indicate that, when Arneault directed corporate counsel to make these statements, Arneault was speaking not for himself personally but in his capacity as a fiduciary of MTR and/or PIDI. Nor can it be assumed, for purposes of establishing a causal nexus between the protected activity and the alleged retaliatory conduct, that those on the receiving end of these communications would have understood that the speech and/or petitioning was meant to be imputed to Arneault personally.  On the contrary, the grievances to which corporate counsel was objecting in instances (a), (b) and (d) involved corporate grievances.

By contrast, the correspondence sent to the "PGCB's Executive Director" – presumably, Defendant O'Toole -- on September 25, 2007 arguably constitutes protected conduct on the part of Arneault.  In that correspondence, which appears to have been written in the wake of the Gregory Beight interview, counsel complained of allegedly tortious conduct taken against Arneault personally, as well as others.  The correspondence complained of efforts to "besmirch" Arneault, and it contended that Arneault and others may have legal claims against the BIE agents involved in the interview.  Construed most favorably to Arneault, this incident could be viewed as an attempt by Arneault (along with others) to personally petition the PGCB for redress of perceived grievances.

Nevertheless, even assuming that the September 25, 2007 correspondence establishes "protected activity" on the part of Arneault, the Amended Complaint fails to establish actionable retaliatory conduct on the part of the named Defendants.  The following are delineated in the Amended Complaint as unlawful retaliatory acts:

    a. Creany's May 2007 actions of serving of an unnecessary and unduly burdensome subpoena on PIDI and threatening to bring two formal enforcement actions against PIDI;

    b. The July 26, 2007 interview of Gregory Beight conducted by Tallent, Brletic, and Smith wherein the agents attempted to coerce Beight into providing false testimony about Arneault and others associated with MTR and PIDI;

    c. The May 21, 2008 ROI generated by BIE-West which contested Arneault's suitability for licensure;

    d. The OEC's Recommendation of Denial issued on January 22, 2010;

    e. The attempts by the PGCB's Bureau of Licensing to unilaterally impose post-hoc SOCs on Arneault in late 2010, after his application for license renewal had been unanimously approved.

(AC ¶ 352 (a)-(e).)

As an initial point, none of these alleged acts of retaliation involve conduct on the part of Defendants O'Toole or Sherman, although they are both named as Defendants in Count 1. It is well-established that liability under §1983 must be premised upon the defendant's personal involvement in the alleged constitutional deprivation and cannot be premised upon a theory of *respondeat superior*. *Evancho v. Fisher*, 423 F.3d 347, 353 (3d Cir.2005) (*citing Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir.1988)). "Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence." *Id*. Because Plaintiffs have not alleged any personal involvement on the part of Sherman or O'Toole relative to the alleged acts of retaliation, Count 1 fails to state any viable claims as to those Defendants.

Count 1 similarly fails, for various reasons, to establish a viable §1983 retaliation claim against the BIE Defendants. Since we have found that the only instance of protected activity that can colorably be attributable to Arneault is the correspondence which was sent on September 25, 2007 threatening potential legal action in the wake of the Beight interview, it necessarily follows that Arneault's first two alleged instances of adverse treatment – both of which predated the September 25, 2007 correspondence – cannot have been acts of retaliation causally related to the alleged protected conduct.

With regard to the last alleged instance of retaliation – i.e., the attempts by the Bureau of Licensing to unilaterally impose SOCs on Arneault in late 2010 after his application for license renewal had already been approved, this incident similarly fails to state a viable retaliation claim against the BIE Defendants. Plaintiffs do not attribute this alleged misconduct to any particular named Defendant, and the only individual identified

29

in the Amended Complaint as being associated with the PGCB's Bureau of Licensing is Susan Hensel, who allegedly was its Director. Hensel is not a named Defendant in this lawsuit, however, and the Amended Complaint fails to allege any facts which implicate the BIE Defendants in this particular incident of alleged retaliation. Because Plaintiffs have failed to allege the personal involvement of any BIE Defendant relative to the attempted imposition of post-hoc SOCs on Arneault, this alleged misconduct fails to state a viable §1983 retaliation claim.

The only remaining instances of alleged retaliation against Arneault concern the Report of Investigation generated on May 21, 2008 and the ensuing Recommendation of Denial issued by the OEC on January 22, 1010. The BIE-Defendants contend that these aspects of Arneault's retaliation claim should be dismissed under *Twombly* and *Iqbal* because Plaintiffs have failed to allege the actual involvement of each of the individual BIE Defendants. The Court agrees with this argument in part.

Insofar as the May 21, 2008 Report of Investigation is concerned, Plaintiffs have alleged in the body of their Amended Complaint that the Report was authored by Defendant Brletic (*see* AC ¶ 187) and that it incorporated false information obtained by Brletic from Charles Sack. (*See id*. at ¶¶ 178, 182, 185-190.) Because no other named Defendant has been identified as personally involved in the May 21, 2008 ROI, this aspect of Arneault's retaliation claim can proceed, if at all, against Brletic alone.

Insofar as the January 22, 2010 Recommendation of Denial is concerned, Plaintiffs allege only that the Recommendation was issued by the Office of Enforcement Counsel. However, the only named Defendant herein that is alleged to be a part of the Office of Enforcement Counsel is Creany, and the Recommendation of Denial, in fact,

30

bears his signature alone.[5]  Accordingly, this aspect of Arneault's retaliation claim can proceed, if at all, only against Creany.

However, even these claims in their more telescoped form fail to establish a viable basis for recovery under §1983.  The BIE Defendants argue that these alleged acts of retaliation are protected either by quasi-judicial immunity or qualified immunity.  They further argue that no causal link can be inferred between the alleged protected conduct and the alleged retaliatory act.  Because we agree with this last point, we need not address the Defendants' invocation of quasi-judicial and/or qualified immunity.

A valid §1983 retaliation claim, as we have noted, requires three elements:  (1) constitutionally protected activity on the part of the plaintiff; (2) adverse action against the plaintiff that would deter a person of ordinary firmness from exercising his constitutional rights; and (3) a causal link between the first two elements.  *Thomas,* 463 F.3d at 296.  To establish the requisite causal connection, a plaintiff usually must prove either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link.  *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007) (citing *Krouse v. American Sterilizer Co*., 126 F.3d 494, 503-04 (3d Cir.1997); *Woodson v. Scott Paper Co*., 109 F.3d 913, 920-21 (3d Cir.1997)).  In the absence of that proof the plaintiff must show that from the "evidence gleaned from the record as a

---

[5] We note that Plaintiffs have supplemented the record by filing a copy of the January 22, 2010 Recommendation of Denial in support of their brief opposing the pending Rule 12(b)(6) motions.  (See Doc. # 80-2.)  Because there is no dispute as to the authenticity of this document, because it is a matter of public record, and because it forms an integral part of Arneault's First Amendment retaliation and Fourteenth Amendment Due Process claims, we may rely upon the document in adjudicating the pending motions to dismiss.  *See Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010) (In deciding a rule 12(b)(6) motion, a court can rely on matters of public record as well as undisputedly authentic documents upon which the complainant's claims are based.).

whole" the trier of the fact should infer causation.  *Id.* (citing *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 281 (3d Cir.2000)).  Plaintiffs claim they have shown all three.  This Court disagrees.

Boiled down to its essentials, Arneault's retaliation claim consists of the following averments.  On July 26, 2007, Defendants Brletic, Tallent and Smith conducted an overly aggressive interview of a prospective PIDI vendor, Gregory Beight, wherein the Defendants falsely accused Arneault of making illegal political contributions and attempted to coerce Beight into giving them false testimony against Arneault and others. On September 25, 2007, Arneault engaged in protected activity by complaining (through counsel) to the PGCB's Executive Director about the agents' tortious conduct and essentially threatening legal action.  Some eight months later, Brletic prepared his May 21, 2008 ROI in which he falsely attributed misconduct to Arneault on the basis of bad information obtained from Charles Sack, and thereby found reason to contest Arneault's suitability for re-licensure.  Some eight months after that, Creany issued his Recommendation of Denial based on the faulty information contained in Brletic's ROI.

Even if we could assume that Brletic and Creany were made aware of the September 25, 2007 correspondence to O'Toole, we cannot say, based on the foregoing averments, that there is an "unusually suggestive temporal proximity" between the September 25, 2007 correspondence and the subsequent acts of alleged retaliation.  Nor are the foregoing allegations sufficient to establish a "pattern of antagonism" between Brletic and Creany on one hand and Arneault on the other such that one could reasonably infer that Brletic and Creany acted with the specific intent to punish Arneault for counsel's September 25, 2007 letter.  If anything, Plaintiffs'

allegations suggest that the impetus behind Brletic's ROI was the derogatory information obtained from Sack and that Brletic had formulated a negative opinion of Arneault even prior to the date of the protected activity.

Finally, we do not agree that the allegations in the Amended Complaint "as a whole" establish the requisite causal connection. Although the Amended Complaint is strewn with averments alleging actions on the part of various governmental employees (Defendants and non-Defendants alike) that were unfavorable to MTR, PIDI, Tecnica, Rubino, Arneault, and others, we cannot abstractly impute all of these various actions to Defendants Brletic and Creany so as to assume on their part a specific motive to punish Arneault for the September 25, 2007 correspondence.[6]

As our circuit court of appeals has explained, there are sound policy reasons which counsel against relaxing the causation element in a § 1983 retaliation case:

> A court must be diligent in enforcing these causation requirements because otherwise a public actor cognizant of the possibility that litigation might be filed against him, particularly in his individual capacity, could be chilled from taking action that he deemed appropriate and, in fact, was appropriate. Consequently, a putative plaintiff by engaging in protected activity might be able to insulate himself from actions adverse to him that a public actor should take. The point we make is not theoretical as we do

---

[6] Plaintiffs have attempted to overcome these deficiencies in Count 1 and elsewhere in their Amended Complaint by alleging an ongoing pattern of wrongful conduct and/or a conspiracy among and between the "Government Defendants"– a term which Plaintiffs broadly define to include "collectively … the Commissioners, former Commissioner(s) named herein, and all employees, former employees, attorneys, [and agents] of the Pennsylvania Gaming Control Board." (See AC [50] "Introduction" at n. 1, p. 2.) We find that Plaintiffs' repeated, generic references to the "Government Defendants" (see, e.g., AC ¶¶ 78, 79, 133, 143, 165, 190, 237, 245, 246-47, 276, 284, 352(b), 353-61) and their conclusory allegations of a "conspiracy" on the part of these "Government Defendants" (see, e.g., id. at "Introduction," pp. 3-5, and ¶ 246) to be deficient under the pleading standards set forth in Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007) and Ashcroft v. Iqbal, -- U.S. --, 129 S. Ct. 1937, 1949 (2009). See Miles v. Township of Barnegat, 343 Fed. Appx. 841, 845 (3d Cir. 2009) (plaintiffs' single-sentence conclusory allegations of a conspiracy contained in their Amended Complaint were insufficient to allege a plausible conspiracy among the defendants to deprive the plaintiffs of their constitutional rights under § 1983) (citing Iqbal, 129 S. Ct. at 1949).

not doubt that public actors are well aware that persons disappointed with official decisions and actions frequently bring litigation against the actors responsible for the decisions or actions in their individual capacities, and the actors surely would want to avoid such unpleasant events.[ ]  Thus, it would be natural for a public actor to attempt to head off a putative plaintiff with the unwarranted expenditure of public funds. Courts by their decisions should not encourage such activity and, by enforcing the requirement that a plaintiff show causation in a retaliation case, can avoid doing so as they will protect the public actor from unjustified litigation for his appropriate conduct. In this regard we recognize that often public actors such as those in this case must make a large number of decisions in charged atmospheres thereby inviting litigation against themselves in which plaintiffs ask the courts to second guess the actors' decisions.

*Lauren W. ex rel. Jean W. v. DeFlaminis, supra,* at 267-68 (internal footnote omitted).

Although we need not, and do not, render any opinion as to whether the alleged conduct on the part of Brletic and Creany was appropriate, we do find that the allegations in the Amended Complaint are insufficient to establish a viable §1983 claim premised on the abridgment of Arneault's First Amendment rights.  Accordingly, Count 1 of the Amended Complaint will be dismissed.

### 2.  *Alleged Violations of Rubino's First Amendment Rights*

In Count 2 of the Amended Complaint, Rubino asserts that O'Toole, Sherman, the Commissioner Defendants, and the BIE Defendants violated his First Amendment rights by retaliating against him for undertaking protected speech and petitioning for the redress of grievances.  Unlike Arneault, Rubino has alleged acts of protected conduct which can be fairly imputed to him and which are therefore sufficient to satisfy the first element of his §1983 retaliation claim.  The adverse actions which he claims to have suffered as a result of that protected speech are as follows:

a. In response to a March 7, 2006 letter from Rubino's counsel opining that Rubino and Tecnica had no filing obligations under the Gaming Act, Susan Hensel, Director of the PGCB's Bureau of Licensing, sent a reply letter dated March 21, 2006 in which she (i) refused to assent to Rubino's position; (ii) outlined various options for him, including termination of Tecnica's consulting agreement with MTR; and (iii) warned that PIDI's licensing would be delayed in the event Rubino and/or his wife either sought a waiver of the filing requirements or petitioned the Board for declaratory relief.

b. By letter dated July 7, 2006 the PGCB informed counsel for MTR/PIDI that, following a review of the waiver forms submitted by Rubino, it had determined that Rubino and his wife were required to file Key Employee Qualifier forms and Multi-Jurisdictional Applications, and Tecnica would have to submit a Conditional/Category 1 Application as an affiliate of PIDI. Further, all these forms would have to be filed by July 14, 2006 -- a task that Plaintiffs contend was onerous, practically impossible, and unprecedented.

c. In October of 2006, the PGCB threated Rubino and MTR/PIDI with an "11th hour" delay of six months in PIDI's licensure approval if the consulting agreement between MTR/PIDI and Tecnica were not terminated.

d. Thereby, in October 2006, PGCB essentially forced MTR/PIDI to terminate their consulting agreement with Tecnica.

e. On October 24, 2006, the PGCB unilaterally insisted that MTR/PIDI seek leave to withdraw the Applications of Tecnica and Rubino.

f. On August 20, 2007, the PGCB imposed SOC 58 as a condition for PIDI's Category 1 Slot Operator License.

g. On March 4, 2008, in response to Rubino's petition seeking relief from SOC 58, Creany, representing the OEC, took the position that Rubino lacked standing to assert the petition, thereby reversing his previous stance.

h. In September of 2009, the PGCB refused to address the merits of Rubino's petition for relief from SOC 58. Instead, the PGCB met privately and voted to hold Rubino's petition in "abeyance" pending the completion of certain conditions which the PGCB knew Rubino could not meet.

i. On at least two occasions in 2010, Defendants Sherman and Creany refused to respond to the attempt by Rubino's counsel to make contact for the purpose of resolving the SOC 58 ban.

     j.   Following the conclusion of Arneault's hearing on re-licensure, Pitre and the OEC failed to honor its promise to seek the repeal of SOC 58.

(AC ¶ 367(a) – (j).)

Like Arneault, Rubino has alleged the involvement of a variety of government actors, either as recipients of the alleged protected speech or as perpetrators of alleged retaliatory acts. Because § 1983 liability must be premised upon the actor's own personal involvement in the allegedly tortious conduct, however, we will analyze Plaintiffs' allegations as they pertain to each group of Defendants.

We begin by noting that none of the asserted acts of retaliation involve O'Toole, who is among the Defendants named in Count 2. Because Plaintiffs have failed to offer any allegations implicating wrongful conduct on the part of O'Toole, Count 2 cannot proceed as against him.

With respect to Defendant Sherman, the only retaliatory conduct alleged is Rubino's claim that, on various occasions in 2010, he made various attempts through counsel to contact Sherman for the purpose of resolving the SOC 58 ban, but Sherman refused to respond to his attorney. By definition, this is insufficient to establish "adverse action" on the part of Sherman, much less can it establish retaliatory action that would "deter a person of ordinary firmness from exercising his or her rights." *Lauren W. ex rel. Jean W.,* 480 F.3d at 267. Accordingly, Rubino has failed to state a viable retaliation claim against Sherman in Count 2.

With respect to the BIE Defendants, the only individual implicated in the alleged misconduct is Defendant Creany. None of the other BIE Defendants named in Count 2

are associated with any of the alleged retaliatory acts.[7]  Furthermore, it does not appear that Rubino has attempted to defend Count 2 as against any BIE Defendant other than Creany.  Accordingly, we will narrow our focus to his alleged actions specifically.

Relative to Defendant Creany, Count 2 asserts the following retaliatory acts:  (a) disputing Rubino's standing to litigate his petition challenging SOC 58 after previously taking a contrary position relative to Rubino's standing; and (b) refusing to respond to Rubino's counsel's attempts in 2010 to make contact for the purpose of resolving SOC 58.

For the reasons previously discussed in relation to Defendant Sherman, Creany's alleged refusal to respond to the efforts by Rubino's counsel to resolve the ban imposed by SOC 58 is insufficient to satisfy the second element of Rubino's retaliation claim. Such conduct is neither affirmative action nor sufficiently adverse such that it would deter a person of ordinary firmness from exercising his or her constitutional rights.

Rubino's remaining complaint against Creany (i.e., his argument that Rubino lacked standing to petition for the removal of SOC 58) likewise fails to state a viable retaliation claim.  Only four acts of protected speech are alleged to have occurred prior to the date of this incident (March 4, 2008), three of which were directed to the PGCB. As to these three instances of protected speech (the March 7, 2006 correspondence directed to Lisa McClain of the PGCB, the April 4, 2006 correspondence directed to the Director of the Bureau of Licensing, and the July 13, 2006 correspondence directed to Jacqueline Atterbury-Minor), Rubino has failed to allege any facts from which we can

_____

[7] One of the alleged acts of retaliation involves the allegation that Chief Enforcement Counsel Pitre and the OEC failed to honor the second part of its agreement with Arneault to recommend to the Board that it terminate SOC 58.  Based upon the averments in the Amended Complaint, however, this claim appears to principally implicate the conduct of Pitre, who is not a named Defendant in this action.

fairly infer Creany's awareness of the protected speech. The only other instance of alleged protected speech occurring prior to March 4, 2008 occurred on February 13, 2008, when Rubino actually filed his petition challenging SOC 58. In essence, then, Rubino is asserting that he engaged in protected conduct by filing his petition to remove SOC 58, and Creany retaliated against this by answering the petition with a challenge to Rubino's standing.

As a matter of law, Creany's alleged actions in this regard do not amount to actionable retaliation. As with Rubino's other complaint about Creany, we find this alleged misconduct too *de minimis* to chill a person of ordinary firmness from engaging in protected activity.[8] Accordingly, Rubino's § 1983 retaliation claims against Creany and/or the BIE Defendants cannot withstand a Rule 12(b)(6) analysis.

The heart of Rubino's retaliation claim appears to be directed against the Commissioner Defendants. As Rubino explains in his brief, he is essentially complaining that these Defendants retaliated against him by requiring him to be licensed as a principal of MTR, forcing the termination of the consulting agreement between Tecnica and MTR, insisting that MTR/PIDI withdraw Rubino's application for a gaming license, imposing SOC 58 as a condition of PIDI's gaming license, and holding any decision on Rubino's petition to remove SOC 58 in abeyance until he had filed for a gaming license. (Pl.s' Resp. to Def.s' Mot. to Dismiss the Amended Compl. [73] at pp. 30-31.)

---

[8]Even if this were not so, we would find that this aspect of Rubino's § 1983 retaliation claim is barred by the applicable statute of limitations, which we discuss in greater length relative to the Commissioner Defendants, *infra*.

Defendants move for dismissal of these claims on a number of bases. For one, they argue that they are entitled to absolute, quasi-judicial immunity relative to the complained-of conduct. Alternatively, they claim that they are entitled to qualified immunity, first because the Amended Complaint fails to state a violation of Rubino's rights and secondly, because their own alleged conduct did not violate any right of Rubino's that was clearly established. Third, Defendants claim that some of Rubino's claims are untimely. Finally, they contend that the *Rooker-Feldman* Doctrine deprives this Court of jurisdiction over Rubino's claims arising out of the Board's September 2009 adjudication holding Rubino's SOC 58 petition in abeyance. Because we find the Defendants' statute-of-limitations and quasi-judicial immunity defenses dispositive of Count 2, we need not address the Commissioner Defendants' remaining defenses to Rubino's retaliation claims.

The statute of limitations for a § 1983 claim is governed by the personal injury tort law of the state where the cause of action arose. *Kach v. Hose*, 589 F.3d 626, 634 (3d Cir. 2009) (citing *Wallace v. Kato*, 549 U.S. 384, 387 (2007)). For § 1983 claims arising in Pennsylvania, the applicable limitations period is two years. *Id*. (citing 42 Pa. Cons. Stat. §5524(2) and *Kost v. Kozakiewicz*, 1 F.3d 176, 189-90 (3d Cir.1993)).

The date on which a cause of action under § 1983 accrues is determined by federal law. *Kach*, 589 F.3d at 634 (*citing Genty v. Resolution Trust Corp*., 937 F.2d 899, 919 (3d Cir.1991)). Under federal law a §1983 claim accrues, and the statute of limitations begins to run, "when the plaintiff knew or should have known of the injury upon which its action is based." *Id*. (*quoting Sameric Corp. v. City of Philadelphia*, 142 F.3d 582, 599 (3d Cir.1998) (citation omitted); *Montgomery v. De Simone*, 159 F.3d

39

120, 126 (3d Cir.1998)).  Determining the date of accrual involves an objective inquiry: "[courts] ask not what the plaintiff actually knew but what a reasonable person should have known."  *Id*. (*citing Barren v. United States*, 839 F.2d 987, 990 (3d Cir.1988)).  Generally, a cause of action is considered to have accrued "at the time of the last event necessary to complete the tort, usually at the time the plaintiff suffers an injury."  *Id*. (*citing United States v. Kubrick*, 444 U.S. 111, 120 (1979)).  As our appellate court has explained,

> [t]he cause of action accrues even though the full extent of the injury is not then known or predictable.  Were it otherwise, the statute would begin to run only after a plaintiff became satisfied that he had been harmed enough, placing the supposed statute of repose in the sole hands of the party seeking relief.

*Kach, supra*, at 634-35 (*quoting Wallace*, 549 U.S. at 391 (internal quotation marks and citations omitted)).

In this case, Plaintiffs commenced their lawsuit on April 15, 2011.  Accordingly, we agree with the Commissioner Defendants that any claims which accrued prior to April 15, 2009 are time-barred.  In the context of Count 2, this means that Rubino's retaliation claims are time-barred to the extent they are premised upon the Commissioner Defendants' alleged involvement in requiring him to be licensed as a principal of MTR, forcing the termination of the Tecnica-MTR-PIDI consulting agreement,[9] insisting that MTR/PIDI withdraw Rubino's gaming license application, and

_____

[9] To the extent Rubino is claiming retaliatory conduct by Defendants Brletic, Tallent, and Rendin in connection with the October 2006 termination of Tecnica's consulting agreement with MTR and PIDI (see AC ¶ 126), this claim is likewise time-barred as against the BIE-Defendants.  Although Plaintiffs claim they did not discover the role that these BIE Defendants allegedly played in the termination of Tecnica's consulting agreement until Brletic's deposition on August 10, 2010, such an averment does not prevent Rubino's retaliation claim from being time-barred relative to the BIE Defendants.  *See Graff v. Kohlman*, 28 Fed. Appx. 151, 154 (3d Cir. 2002) ("In general, the rule that a cause of action accrues upon discovery

imposing SOC 58 as a condition of PIDI's licensure. According to the averments in the Amended Complaint, each of these acts of alleged retaliation occurred no later than August 20, 2007 – more than three and one-half years prior to the commencement of this case.

Rubino contends, however, that these acts of retaliation should be considered timely under the "continuing violation doctrine," which is an "equitable exception to the timely filing requirement." *Cowell v. Palmer Tp*., 263 F.3d 286, 292 (3d Cir.2001). Under the continuing violation doctrine, as applied by the Third Circuit Court of Appeals, "when a defendant's conduct is part of a continuing practice, an action is timely so long as the last act evidencing the continuing practice falls within the limitations period." *Id*. (*quoting Brenner v. Local 514, United Broth. of Carpenters and Joiners of Am*., 927 F.2d 1283, 1295 (3d Cir.1991)). The doctrine will apply only where the plaintiff can establish that the defendant's conduct is "more than the occurrence of isolated or sporadic acts." *Id*. (*quoting West v. Philadelphia Elec. Co*., 45 F.3d 744, 755 (3d Cir.1995)).

This inquiry involves consideration of three factors, *to wit*: (1) subject matter – *i.e.*, whether the violations constitute the same type of discrimination, tending to connect them in a continuing violation; (2) frequency – *i.e.*, whether the acts are recurring or more in the nature of isolated incidents; and (3) the degree of permanence – *i.e.*, whether the act had a degree of permanence such that it should have triggered the plaintiff's awareness of and duty to assert his rights and whether the consequences of the act would continue even in the absence of a continuing intent to discriminate.

of the injury does not require that a plaintiff have identified every party who may be liable on its claim.") (citation omitted).

*Cowell, supra,* at 292 (*citing West*, 45 F.3d at 755 n. 9). Of these, the third factor is the most important. *Id*. (citing *Berry v. Board of Supervisors of Louisiana State Univ.*, 715 F.2d 971, 981 (5th Cir. 1983)).

The continuing violation doctrine recognizes that there may be situations where the illegality of a defendant's conduct becomes apparent only over a period of time and, in such cases, an otherwise diligent plaintiff should not be penalized for his or her delay in filing suit. *See Foster v. Morris*, 208 Fed. Appx. at 177-78, 2006 WL 3712949 at *2 (recognizing the doctrine as "an equitable exception to a strict application of a statute of limitations where the conduct complained of consists of a pattern that has only become cognizable as illegal over time.").

On the other hand, where the conduct consists of a discreet and actionable injury of which a reasonable plaintiff would have been aware, the doctrine has no application. *See Seawright v. Greenberg*, No. 05-5295, 2007 WL 1170704 at *3 (3d Cir. April 20, 2007) (continuing violations theory does not apply in cases where the plaintiff is aware of the injury at the time it occurred) (citation omitted); *Morganroth & Morganroth v. Norris, McLaughlin & Marcus, P.C.*, 331 F.3d 406, 417 n. 6 (3d Cir.2003) (same) (*citing Kichline v. Consolidated Rail Corp.*, 800 F.2d 356, 360 (3d Cir.1986)). Thus, "causes of action that can be brought individually expire with the applicable statute of limitations period." *O'Connor v. City of Newark*, 440 F.3d 125, 128 (3d Cir.2006). In short, "if prior events should have alerted a reasonable person to act at that time the continuing violation theory will not overcome the relevant statute of limitations." *King v. Township of East Lampeter*, 17 F.Supp.2d 394, 416 (E.D.Pa.1998), *aff'd*, 182 F.3d 903 (3d

Cir.1999) (TABLE, NO. 98-1806). *See also MFS, Inc. v. Twp. of South Annville*, Civil Action No. 1:05-CV-1371, 2006 WL 3254535 at *4 (*quoting King* ).

With respect to Count 2, Rubino contends that the Commissioner Defendants' adverse acts against him were part of an on-going pattern of retaliatory conduct which culminated in their September 2, 2009 decision to hold his petition challenging SOC 58 in abeyance. Rubino therefore concludes that all of these alleged adverse acts should be considered timely because the most recent one -- the Board's September 2, 2009 decision -- fell within the applicable two-year limitations period. We disagree.

Even if the first two elements of the continuing violation prong could be satisfied here, the third and most important element cannot be. That is because each of the allegedly retaliatory acts undertaken by the Commissioner Defendants, up to and including the imposition of SOC 58 in August 2007, was sufficiently adverse to Rubino's interests, and the consequences of each act were sufficiently permanent, as to put a reasonable person on notice that these acts could support a viable claim for retaliation. Accordingly, the continuing violation doctrine has no applicability relative to Count 2 of the Amended Complaint, and Rubino's retaliation claims are time-barred to the extent they are premised upon conduct occurring prior to April 15, 2009.

The only remaining act of alleged retaliation by the Commissioner Defendants occurring within the limitations period is their September 2, 2009 adjudication holding Rubino's petition for relief from SOC 58 in abeyance pending his registration as a vendor of PIDI. To the extent Rubino's retaliation claim is premised upon the Board's September 2, 2009 ruling – and assuming this event could serve as a discreet,

actionable form of retaliation,[10] we find that this claim, even if timely, fails to survive a Rule 12(b)(6) analysis due to the Commissioner Defendats' entitlement to absolute, quasi-judicial immunity.

In *Keystone Redevelopment Partners, LLC v. Decker,* 631 F.3d 89 (3d Cir. 2011), the Third Circuit Court of Appeals ruled that former members of the PGCB were entitled to absolute, quasi-judicial immunity from suits brought against them in their individual capacities based on their decisions to grant gaming licenses to certain applicants other than the plaintiff. The court explained that "quasi-judicial immunity attaches to public officials whose roles are 'functionally comparable' to that of a judge, 631 F.3d at 95 (quoting *Hamilton v. Leavy,* 322 F.3d 776, 785 (3d Cir. 2003)), and that such immunity "'flows not from rank or title or location within the Government, but from the nature of the responsibilities of the individual official.'" *Id.* (quoting *Cleavinger v. Saxner*, 474 U.S. 193, 201 (1985)). In arriving at its decision, the Court of Appeals analyzed six "non-exhaustive" factors identified by the Supreme Court as "'characteristic of the judicial process,'" 631 F.3d 89 (citing *Cleavinger*, *supra* at 202), *to wit,*

> (a) the need to assure that the individual can perform his functions without harassment or intimidation; (b) the presence of safeguards that reduce the need for private damages actions as a means of controlling unconstitutional conduct; (c) insulation from political influence; (d) the importance of precedent; (e) the adversary nature of the process; and (f) the correctability of error on appeal.

---

[10] As we discuss in more detail, *infra,* "[t]he focus of the continuing violations doctrine is on *affirmative* acts of the defendants." *Cowell v. Palmer Tp.*, 263, F.3d 286, 293 (3d Cir. 2001) (emphasis added). For purposes of Count 2, we will assume that the Board's September 2, 2009 decision to hold Rubino's SOC 58 petition in abeyance – which he claims placed him in an impossible "catch 22" situation – could be viewed as an affirmative act of retaliation taken in response to Rubino's protected conduct of March 29, 2009 when he allegedly spoke out at a public meeting of the PGCB. However, for the reasons discussed in connection with our analysis of Count 4, we do not view the Board's September 2, 2009 ruling as an "affirmative" act which deprived Rubino of any constitutionally protected property or liberty interest.

The *Keystone* Court found that these factors, on balance "clearly support quasi-judicial immunity for members of the Pennsylvania Gaming Control Board." 631 F.3d 101.

Rubino attempts to distinguish *Keystone* by asserting that the alleged retaliatory acts set forth in Count 2 had nothing to do with the Board's functions in adjudicating whether or not to grant or deny a license. However, to the extent Rubino reads *Keystone* as limiting the applicability of quasi-judicial immunity solely to the Commissioner Defendants' decisions as to whether or not to award a particular applicant a gaming license, we believe he is construing the legal principle too narrowly. Although the Commissioner Defendants' September 2, 2009 ruling relative to Rubino's petition did not specifically involve the granting or denial of a gaming license, it directly implicated a specific condition of PIDI's (already existing) gaming license, which is why MTR and PIDI were required to be joined in that matter.

Nor is this Court persuaded by Rubino's attempts to compare this case to *Forrester v. White*, 484 U.S. 219 (1988) and *Supreme Court of Virginia v. Consumers Union of the United States,* 446 U.S. 719 (1980). *Forrester* held that a state court judge lacked immunity from a damages suit under §1983 which was premised upon his allegedly discriminatory employment decision vis-à-vis a court probation officer. The *Consumers Union* case held that the Supreme Court of Virginia and its justices were proper defendants in a suit for declaratory and injunctive relief to the extent the court and its members had the power to independently enforce provisions of the state bar code prohibiting attorneys from advertising and were being sued in their enforcement capacity. 446 U.S. at 736. The Supreme Court likened the Virginia court's enforcement powers to those of prosecutors, who enjoy absolute immunity from damages liability but

45

who may properly be named in §1983 injunctive suits, "since they are the state officers who are threatening to enforce and who are enforcing the law." *Id*.

Both of these cases involved situations which are easily distinguishable from the case at bar. The conduct at issue in *Forrester* -- an allegedly discriminatory employment decision by a judge – involved conduct which was plainly administrative in nature. The ruling in *Consumers Union* merely recognized that a state court and its members could be sued for declaratory or injunctive relief when acting in an enforcement capacity. Here, of course, we are concerned with a suit for money damages, not one seeking injunctive or declaratory relief.

Rubino contends that two of the factors analyzed in *Keystone* – the adversarial nature of the process and the availability of appellate relief – are not present here and, therefore (he claims), the alleged retaliatory acts by the Commissioner Defendants cannot be considered quasi-judicial. (By implication, Rubino apparently does not challenge the presence of the other *Keystone* factors here.) However, our circuit court of appeals has made clear that "not every [one of these] factor[s] must be satisfied for an official to be entitled to quasi-judicial absolute immunity." *Keystone Redevelopment Partners,* 631 F.3d at 100 (internal footnote added).

In any event, insofar as the Commissioner Defendants' September 2, 2009 ruling is concerned, we conclude that the adversarial nature of the proceedings, the presence of numerous procedural safeguards, and the availability of at least limited appellate relief all justify application of quasi-judicial immunity. Notably, in its September 2, 2009 adjudication, the Board issued findings of fact and conclusions of law upon Rubino's petition in light of its consideration of the hearing officer's Report and Recommendation.

46

En route to arriving at her R&R, the hearing officer received briefing both from Rubino and the OEC, required MTR and PIDI to be joined as interested parties, allowed for a period of discovery, held an evidentiary hearing, and accepted post-hearing briefs from any party interested in submitting one.   At the evidentiary hearing, all parties were present after having received notice, were represented by counsel, and were given an opportunity to offer sworn testimony and/or documentary evidence.  (See Ex. A to PGCB Defs.' Mot. to Dismiss [58-1] at pp. 2-3.)  Pursuant to applicable regulations, the hearing was subject to numerous procedural safeguards.  See generally 58 Pa. Code. §491a.8, § 494a.1, and § 494a.4.   Following the hearing officer's issuance of her written R&R, the parties were afforded an opportunity to file exceptions to the R&R and responses thereto.  (See Ex. B to PGCB Defs.' Mot. to Dismiss [58-2] at p. 2.)  Then, after the Board issued its September 2, 2009 adjudication, Rubino sought, and received, at least partial appellate review relative to a controlling issue of law.  *See Rubino v. Pennsylvania Gaming Control Board*, 1 A.3d 976 (Pa. Commw. Ct. 2010).  In light of these circumstances, we conclude that the Commissioner Defendants were acting in a "judicial" function when they issued their September 2, 2009 adjudication.[11]

---

[11] In *Dotzel v. Ashbridge*, 438 F.3d 320 (3d Cir. 2006), the court quoted the First Circuit Court of Appeals thusly in summarizing the appropriate inquiry:

> First, does a Board Member, like a judge, perform a traditional "adjudicatory" function, in that he decides facts, applies law, and otherwise resolves disputes on the merits (free from direct political influence)? Second, does a Board member, like a judge, decide cases sufficiently controversial that in the absence of absolute immunity, he would be subject to numerous damages actions? Third, does a Board member, like a judge, adjudicate disputes against a backdrop of multiple safeguards designed to protect [the parties'] constitutional rights?

438 F.3d at 325 (*quoting Bettencourt v. Board of Registration*, 904 F.2d 772, 783 (1st Cir. 1990)).  All of these conditions were satisfied relative to the Commissioner Defendants' September 2, 2009 ruling, buttressing our conclusion that these requisite features of "judicial functioning" were present.

Fundamentally, Rubino's arguments against application of quasi-judicial immunity overlook the fact that the relevant inquiry "goes to the official's *job function*, as opposed to the particular *act* of which the plaintiff complains." *Dotzel v. Ashbridge,* 438 F.3d 320, 325 (3d Cir. 2006). "Thus," our court of appeals has explained, "the relevant decisional material will be the legal and structural components of the job function, as opposed to detailed facts about specific acts and mental states." *Id*. Because the Board of Commissioners was functioning as a quasi-judicial body when it issued its September 2, 2009 ruling, the Commissioner Defendants are entitled to absolute immunity from any claims premised upon that adjudication.

There being no other actionable basis for Rubino's §1983 retaliation claim, Count 2 of the Amended Complaint will be dismissed.

### 3. *Alleged Violations of Arneault's Due Process Rights*

We next consider Arneault's § 1983 claim, set forth in Count 3 of the Amended Complaint, that his federal due process rights were violated by the conduct of O'Toole, Sherman, and the BIE Defendants. The Fourteenth Amendment provides that no person shall be deprived "of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV §1. This guarantee encompasses both a substantive and procedural component. *Nicholas v. Pa. State Univ*., 227 F.3d 133, 139 (3d Cir.2000) (*citing Planned Parenthood of S.E. Pa. v. Casey*, 505 U.S. 833, 846–47 (1992)). Since we construe Count 3 to assert violations of both Arneault's procedural and substantive due process rights, we will address both theories.

a.  <u>Procedural Due Process</u>

To state a claim under § 1983 for the deprivation of procedural due process rights, a plaintiff must allege (1) a deprivation of a protectable liberty or property interest and (2) that the procedures available did not provide due process of law.  *Pence v. Mayor and Tp. Committee of Bernards Tp*., No. 10-3496, 2011 WL 5190124 at *2 (3d Cir. Nov. 2, 2011) (citing *Hill v. Borough of Kutztown*, 455 F.3d 225, 233–34 (3d Cir.2006)).  Thus, our first inquiry must be whether the plaintiff's asserted interest is encompassed within scope of the Fourteenth Amendment's protection.  *Dee v. Borough of Dunmore*, 549 F.3d 225, 229 (3d Cir.2008).

Here, Arneault claims that O'Toole, Sherman, and the BIE Defendants violated his constitutionally-protected liberty and property interests in being free to pursue his calling or occupation without undue governmental interference and in enjoying a stigma-free reputation.  Defendants correctly point out that Arneault does not have a protected property right under state law to engage in the gaming industry, since Pennsylvania law expressly makes the granting of a gaming license a revocable privilege.  See 58 Pa. Code § 421a.1(a) (stating that a "license, permit, certification or registration issuance, renewal or other approval issued by the Board is a revocable privilege" and "[n]o person holding a license, permit, certification … or other approval is deemed to have any property rights…").

On the other hand, however, the Supreme Court has recognized a constitutionally protected liberty interest in one's reputation, where the injury to reputation is accompanied by an alteration of one's legal status under state law.  *Paul v. Davis*, 424 U.S. 693, 708-09 (1976).  Our Circuit Court of Appeals has explained this

49

principle by stating that federal due process rights are implicated when state-occasioned defamation is coupled with the deprivation of a "more tangible interest," *Baraka v. McGreevey*, 481 F.3d 187, 208 (3d Cir. 2007), an inquiry which the court commonly refers to as the "stigma-plus" test. *Hill v. Borough of Kutztown,* 455 F.3d 225, 236 (3d Cir. 2006) (stating that a plaintiff asserting a due process claim based on reputational harm "must show a stigma to his reputation *plus* deprivation of some additional right or interest") (emphasis in the original).

To satisfy the "stigma" part of the "stigma-plus" test, a plaintiff must allege that the purportedly stigmatizing statements (a) were made publicly and (b) were false. *Hill,* 455 F.3d at 236. The BIE Defendants contend that Arneault has failed to establish "stigma" because he has failed to allege that any defamatory statements about him were made public by the BIE Defendants. We agree with this argument in part, but not insofar as Count 3 relates to the alleged conduct of Creany and Brletic.

Notably, Arneault relies on the publication of the January 22, 2010 Notice of Recommendation of Denial as the vehicle by which his reputation was harmed. The Recommendation of Denial was issued by Defendant Creany and was reported on by certain media outlets. Although published in a redacted form, the Recommendation nevertheless indicated that the BIE's background investigation of Arneault had revealed "inaccuracies or inconsistencies" in certain of Arneault's statements which "call[ed] into question [his] character, honesty and integrity" and, thereby, his suitability for licensure under the Gaming Act. (See Pls.' Suppl. to Br. in Opp. at Ex. B [80-2] at p. 2.) It indicates that the BIE Report of Investigation had identified "several areas of concerns relative to [Arneault's] suitability for licensure" without listing those concerns (due to

50

redaction).  The redacted Recommendation further states that "BIE maintains that [Arneault has] not proven by clear and convincing evidence that [he is] a person of good character, honesty, and integrity sufficient to establish [his] eligibility and suitability" for license renewal.  (Id. at p. 3.)  The Amended Complaint sufficiently avers that these aspects of the Recommendation, in effect, called into question Arneault's good character and reputation as a gaming executive based on untrue information, including the untrue accusation that Arneault had made inconsistent or inaccurate statements to government officials concerning the nature of his prior relationship with Charles Sack. Thus, he has sufficiently alleged falsity.

In addition, the Amended Complaint satisfies the "publication" requirement. Although neither the Recommendation nor the Amended Complaint specifically identifies which BIE agents supplied information forming the basis of the Recommendation of Denial, it is clear that Creany issued the Recommendation, presumably with the knowledge that it would be made publicly available.  At the very least, then, Creany has been properly identified as a Defendant in Count 3.  Moreover, the Amended Complaint can be read to suggest that Defendant Brletic deliberately obtained unreliable information from Charles Sack against Arneault and that Brletic used this information to generate the derogatory Report of Investigation that later formed the basis of Creany's Recommendation of Denial.  Construing the Amended Complaint most favorably to Arneault, one could reasonably infer that Brletic undertook these actions deliberately and with the expectation that the misinformation about Arneault would be made public.  Therefore, the averments are sufficient to keep Brletic as a Defendant in Count 3.

As to the other BIE Defendants named in Count 3, we agree that no personal involvement on their part has been alleged relative to the alleged wrongdoing and, therefore, they should be dismissed. The Court reaches the same conclusion as to Defendants Sherman and O'Toole, both of whom are also named as Defendant in Count 3. Because Arneault has failed to identify any personal involvement on the part of these individuals relative to the alleged misconduct, the claims against them will be dismissed.

Having determined that the Amended Complaint adequately alleges "stigma," we must next determine whether Arneault has alleged a sufficient "plus" to make out a constitutionally protected liberty interest under the stigma-plus test. In support of his claim of "plus," Arneault relies heavily on the decision recently rendered by Judge Fischer in *Burns v. Alexander*, 776 F. Supp. 2d 57 (W.D. Pa. 2011). In that case, Melissa Burns, a woman who owned and operated a childcare center, sue for alleged violations of her due process rights that had resulted from a child welfare official's errant finding of "indicated" reports of child abuse supposedly perpetrated by Ms. Burns. Burns was made aware of this finding only after her name had already been listed in the state's central register as an "indicated" child abuser. As a result of her status as an "indicated" abuser, Burns was required to remove herself from her child care center and inform the parents of her students of the situation. Burns was also informed that she would lose her operating license and was required to display a notice to that effect at the entrance to the center. Further, her center lost its favorable 3-star rating status as well as some $30,000 in grant and tuition funding which it had previously received under a state-sponsored early childhood learning initiative.

In evaluating whether Burns had established a constitutionally protected liberty interest based on reputational harm, the district court noted that Burns was relying "not simply on the negative implications that [the welfare official's] finding had on her employment prospects, but also on more tangible injuries such as her temporary removal from [the child care center she ran], the decision not to renew her operating license, [the center's] suspension from the Keystone STARS program, and her loss of over $30,000.00 in grant money and tuition support." 776 F. Supp. 2d at 83. The court therefore found that "[t]he listing of Burns' name in the central register constituted an 'alteration of [her] legal status' under Pennsylvania law." Id. (quoting *Paul*, 424 U.S. at 708) (alteration in the original). "When 'combined with the injury resulting from [ ] defamation,' such an 'alteration of legal status,'" the court concluded, "justifies the 'invocation of procedural safeguards.'" *Id*. (quoting *Paul, supra*, at 708-09)(alteration in the original; footnote omitted).

Whether Arneault has alleged comparably severe and tangible "plus" factors here is a dubious. Unlike Ms. Burns, for example, Arneault does not allege that he was removed from his then-existing source of employment as a result of Creany's unfavorable Recommendation. Nor, unlike Ms. Burns, was Arneault ever informed that his gaming license *would not be renewed;* rather, Arneault was told only that a recommendation along those lines was being made. Arneault also does not allege any change in his statutory eligibility to obtain grants or other funding upon which he had previously been relying, as was the case in *Burns*. In fact, Arneault never lost his statutory eligibility to participate in gaming because his license was renewed. In short, unlike Burns, who established the necessary "plus" by relying on more than "simply …

53

the negative implications that [the "indicated" abuse] finding had on her employment prospects," 776 F. Supp. 2d at 83, Arneault is relying specifically and *solely* on the negative implications that the Recommendation of Denial had on his employment prospects.  (See Pls.' Br. in Opp. to Mot. to Dismiss [73] at p. 52 (arguing that the defamatory allegations contained in the Recommendation of Denial "have damaged [Arneault's] present and future career prospects by tarnishing the widely-known reputation of competence and integrity that Arneault cultivated over a period of decades"); AC ¶ 251 (alleging that, "because of the actions of the Defendants, Mr. Arneault has not been sought out (as would have been expected given his unparalleled success in the industry) to participate in gaming-related opportunities in Ohio and other venues").)

We therefore have some doubts as to whether Arneault, like Ms. Burns, has successfully pled an alteration of his legal status.  *Cf. Burns*, 776 F. Supp. 2d at 83 ("The listing of Burns' name in the central register constituted an 'alteration of [her] legal status' under Pennsylvania law.") (citation omitted) (alteration in the original). Nonetheless, this Court will proceed on the assumption, without deciding, that Arneault has alleged sufficient facts to establish the necessary "plus."

Merely assuming that Arneault has satisfied the "stigma plus" test does not end our inquiry, however, because Arneault must still demonstrate that the process afforded him was constitutionally deficient.  See *Whittaker v. Count of Lawrence*, 674 F. Supp. 2d 668, 694 (W.D. Pa. 2009) ("Once it is determined that the Due Process Clause is implicated by a specific deprivation of liberty or property, the relevant question becomes what process is due' under the particular circumstances.") (*quoting Morrissey v. Brewer*,

408 U.S. 471, 481 (1972)).  This is where Plaintiffs' Count 3 falls short of stating a viable

§1983 claim.

As the *Burns* Court observed, the concept of "due process" is somewhat pliable:

> "The very nature of due process negates any concept of inflexible
> procedures universally applicable to every imaginable situation."  *Cafeteria
> & Restaurant Workers Union v. McElroy*, 367 U.S. 886, 895, 81 S. Ct.
> 1743, 6 L.Ed.2d 1230 (1961).  "The standard for determining what process
> is due in a given situation is rather flexible, since the due process inquiry
> eschews reliance on rigid mandates in favor of an approach which
> accounts for the factual circumstances of the particular situation at issue."
> *Tristani v. Richman*, 609 F. Supp. 2d 423, 481 (W.D.Pa.2009).

776 F. Supp. 2d at 83.  The relevant inquiry for determining what the due process

Clause requires under a given set of circumstances is set forth in *Mathews v. Eldridge*,

424 U.S. 319 (1976), and requires consideration of three factors:

> [f]irst, the private interest that will be affected by the official action; second,
> the risk of an erroneous deprivation of such interest through the
> procedures used, and the probable value, if any, of additional or substitute
> procedural safeguards; and finally, the Government's interest, including
> the function involved and the fiscal and administrative burdens that the
> additional or substitute procedural requirement would entail.

*Id*. at 334-35.  These factors must be balanced to determine what type of procedures

would "assure fairness in a particular case."  *Graham v. City of Philadelphia,* 402 F.3d

139, 146 (3d Cir. 2005) (citing *Mathews, supra*, at 335).

In *Graham v. City of Philadelphia,* the Third Circuit Court of Appeals considered

these factors in the context of a probationary police officer who had been terminated

from his job following his arrest on charges of statutory sexual assault and corrupting

the morals of a minor.  After a jury later acquitted the police officer of the charges, he

sought reinstatement and a name-clearing hearing, but was denied both.  He then filed

a § 1983 suit alleging a due process violation stemming from reputational damage.

55

In considering the viability of Graham's claim, the Third Circuit Court of Appeals noted that "[t]he principal relief to which an individual is entitled should the government's stigmatizing comments rise to the level of a due process violation is a hearing to clear his name." 402 F.3d at 144 (quoting *Ersek v. Township of Springfield*, 102 F.3d 79, 84 (3d Cir. 1996)). The court then went on to hold that Graham was not entitled to such a hearing because his previous criminal trial had satisfied the demands of due process. *Id*. at 144, 147. Applying the *Mathews* factors, the court of appeals concluded:

> [t]here is no doubt that Graham has a genuine interest in his reputation and livelihood. But he has not been denied an opportunity to protect his reputation -- his criminal trial provided him with more than adequate opportunity to refute the allegations asserted against him. And the governmental interests in making personnel decisions in the public interest, communicating those decisions to the public, and conserving public resources, are substantial.

*Graham,* 402 F.3d at 147.

Numerous decisions within this circuit have confirmed the principle that, in the context of alleged reputational harm, the constitutional mandates of due process are satisfied as long as the aggrieved individual is afforded notice and a fair opportunity to clear his or her name. S*ee, e.g., Hill, supra,* at 236 (noting that, when a "stigma plus" deprivation occurs in the public employment context, the employee is entitled to a name-clearing hearing); *Smith v. Borough of Dunmore,* Civil Action No. 3:05-CV-1343, 2011 WL 4458787 at *6-7 (M.D. Pa. Sept. 23, 2011) (assuming plaintiff could establish stigma for his Fourteenth Amendment claim following his temporary suspension from his job, the record established that he had received a name-clearing hearing that satisfied due process requirements); *Bartos v. Pennsylvania Dept. of Environmental*

56

*Protection,* Civil No. 1:08-CV-0366, 2011 WL 2456613 at *15 (M.D. Pa. May 25, 2011) (noting that "the liberty interests protected from harm in a 'stigma-plus' setting can typically be fully vindicated by providing the employee with a 'name-clearing' hearing, either in an administrative context or in a subsequent criminal trial") (*citing Graham, supra*); *Dimucci v. Pennsylvania Convention Center Authority*, Civil Action No. 08-4810, 2010 WL 2640151 at *5 (E.D. Pa. June 29, 2010) (plaintiffs' grievance hearing on charges of vandalism served as an adequate substitute for a name-clearing hearing for purposes of due process; plaintiffs were represented at the hearing and evidence was presented on their behalf such that they had the opportunity "to tell their side of the story").

Here, Arneault's own averments establish that he had a constitutionally adequate opportunity to clear his name by virtue of the hearings which were held over a 5-day period in May of 2010 before the PGCB. (AC ¶ 235.) During the course of these hearings, Arneault was represented by counsel, who offered more than 300 exhibits into evidence on Arneault's behalf. (Id. at ¶ 227.) As the Third Circuit observed in *Keystone,* additional procedural safeguards would have existed by virtue of the statutory and regulatory guidelines applicable to licensure hearings – e.g., notice was required to be given to the parties, *see* 2 Pa. Cons. Stat. § 504; hearings were presumptively open to the public, *see* 4 Pa. Cons. Stat. § 1205(b); the Board had to abide by specific procedures in conducting the hearings, *see* 58 Pa. Code § 441a.7; only sworn testimony could be accepted, *see* 58 Pa. Code § 441a.7(q); the record had to be transcribed, *see id*. at §441a.7(v); and a written decision had to be issued, *see id*. at §441a.7(x). *See Keystone Redevelopment Partners,* 631 F.3d at 98. According to the

Amended Complaint, Arneault was able to demonstrate in the course of these hearings that certain employees of BIE-West and the PGCB intentionally failed to conduct a fair and impartial investigation, resulting in an adverse recommendation that was factually unsupportable. (AC ¶ 236.) As a result of this, Arneault claims he was able to convince Chief Enforcement Counsel Pitre and "certain other Government Defendants" that BIE-West, "principally through the Denial Recommendation and the reports authored by Defendant Brletic, had intentionally and improperly targeted Mr. Arneault." (AC ¶ 237.) Arneault further states that these proceedings culminated in a favorable settlement, a letter from Pitre clearing him of any wrongdoing, and the eventual renewal of his gaming license. (AC ¶¶ 238-243.)

In sum, to the extent Creany's Recommendation of Denial deprived Arneault of a constitutionally protected liberty interest in his good reputation, the May 2010 hearings conducted before the PGCB provided him constitutionally sufficient due process such that no violation of Arneault's Fourteenth Amendment rights can be established based on the averments in the Amended Complaint. The May 2010 administrative hearings, in other words, satisfied any due process requirement that Arneault be afforded a name-clearing hearing.

Arneault, of course, has not requested a name-clearing hearing. Instead, he suggests that due process required he receive notice and an opportunity to be heard *prior* to the issuance of Creany's Recommendation.[12] We disagree. *Mathews*, as we

---

[12] Alternatively, Arneault suggests that Creany should not have published his unfavorable recommendation, which is merely another way of saying that the alleged liberty deprivation should not have occurred. However, it is not clear from the record before us that Creany could have prevented publication of his Recommendation to the Board. *See* 4 Pa. C.S.A. § 1517(a.2)(1)(ii) (stating that one of

have noted, supplies the relevant inquiry as to what process is constitutionally required in a given situation. 424 U.S. at 335.

With respect to the first *Mathews* factor – the private interest that will be affected by the official action – we note that Arneault's interests in removing any tarnish to his reputation caused by suggestions that he is unsuitable for gaming is genuine and weighty, but no more so than was the plaintiff's in *Graham*. The potential reputational harm which Arneault may have suffered because of the Defendants' insinuation that he had made inaccurate statements to investigators and that his good character was being called into question is certainly no greater than the potential reputational harm that the plaintiff in *Graham* was exposed to by virtue of being criminally accused of sexual misconduct with a minor.

The second *Mathews* factor requires consideration of the risk of an erroneous deprivation through the procedures that were used and the probable value, if any, of additional or substitute procedural safeguards. We conclude that the post-deprivation hearing afforded Arneault was adequate to vindicate his reputational interests and significantly reduce the prospect that he would be erroneously deprived of that interest. Although the procedural safeguards in place during the PGCB hearings may not have been quite as robust as those present in a criminal trial, they were more than sufficient to pass constitutional muster. Notably, Arneault does not allege any kind of procedural deficiencies in the hearings that were held; quite to the contrary, his own allegations suggest that, as a result of the administrative hearings, he was able to successfully clear himself of the negative accusations contained in the Recommendation of Denial

the duties of the Office of Enforcement Counsel shall be to file recommendations and objections relating to the issuance of licenses, permits and registrations on behalf of the BIE).

and establish his good character and suitability for licensure. And, although there was a delay of some eight months between the time of Creany's Recommendation and Pitre's letter absolving Arneault of any alleged wrongdoing, this is not substantially longer than the six-month delay that the plaintiff in *Graham* endured as he awaited his trial on sexual assault charges.

In evaluating the "probable value" of any additional safeguards, we note Arneault's contention that a pre-Recommendation hearing was required. However, the Amended Complaint does not necessarily support the assumption that a pre-deprivation hearing would have prevented Creany from acting any differently given Plaintiffs' allegations that Brletic and Creany intentionally targeted Arneault.

In any event, consideration of the third *Mathews* factor – the Government's interests -- seals our conclusion that Arneault was afforded all the process to which he was constitutionally entitled. Here, we consider the fact that the Government has a strong interest in preserving the BIE's/OEC's ability to operate freely and efficiently in investigating potential licensees and in rendering candid licensing recommendations to the Board. Moreover, the Government has an equally strong interest in preserving its limited resources, and this interest would be compromised in the event a pre-Recommendation hearing were required. Since the OEC and BIE are statutorily required to operate independently of the PGCB, *see* 4 Pa. C.S.A. §§ 1516.1 and 1517(a) and 50 Pa. Code §§ 405a.1(a) and 405a.4, requiring a pre-Recommendation hearing would essentially impose upon the Government a duplicative layer of administrative review whereby an applicant could challenge the OEC's recommendation both before and after it was published to the Board.

In sum, then, we find that plaintiff's interests in this case no weightier, the available process no less effective, and the Government's interests no less important than was the case in *Graham*. Because the May 2010 administrative hearings before the PGCB served as an adequate name-clearing opportunity for Arneault, no procedural due process deprivation occurred.[13]

### b. Substantive Due Process

As is true in the procedural due process realm, in order to prevail on a substantive due process claim challenging governmental action, a plaintiff "must establish as a threshold matter that he has a protected property interest to which the Fourteenth Amendment's due process protection applies." *Hill*, 455 F.3d at 235 n. 12 (*quoting Nicholas v. Pennsylvania State Univ.*, 227 F.3d 133, 139-40 (3d Cir. 2000)). Reputational injury that decreases an individual's ability to earn a living is not sufficient to warrant substantive due process protection. *Id. See also Boyanowski v. Capital Area Intermediate Unit*, 215 F.3d 396, 399-404 (3d Cir. 2000) (defamatory statements that curtail a plaintiff's business opportunities do not suffice to support a substantive due

---

[13]  To the extent that *Burns v. Alexander, supra,* can be read as imposing an entitlement to pre-deprivation process, we read that aspect of the court's ruling as being premised upon facts that are materially distinguishable from those at issue in this case. Among other things, the court in *Burns* found it significant that the plaintiff's due process theory was premised partly on alleged facial deficiencies in the governing child welfare statute which, it was said, had resulted in the statute's failure to provide sufficient guidance to child welfare officials regarding how comprehensive an investigation must be in order to produce "substantial evidence of abuse." 776 F. Supp. 2d at 90. This was significant because, as the court noted, "the availability of a post-deprivation tort remedy does not necessarily satisfy the requirements of the Constitution when a deprivation occurs in 'the more structured environment of established state procedures,'" i*d. (quoting Hellenic American Neighborhood Action Committee v. City of New York,* 101 F.3d 877, 880 (2d Cir.1996)), as opposed to situations involving random and unauthorized actions by state officials. Because the same type of situation is not present here, we find this aspect of the court's ruling inapposite.

process claim.")  On the other hand, our court of appeals has stated that "the liberty to pursue a calling or occupation ... is secured by the Fourteenth Amendment."  *Thomas v. Independence Tp.,* 463 F.3d 285, 297 (3d Cir. 2006) (*citing Piecknick v. Commonwealth of Pennsylvania*, 36 F.3d 1250, 1259 (3d Cir.1994)).  Arneault alleges that the Government Defendants named in Count 3 violated his right to follow his chosen occupation free from unreasonable governmental interference.

Defendants have argued that Arneault's allegations fail to establish that he was deprived of his right to pursue his chosen profession, and we agree.  The allegations in the Amended Complaint establish only that Creany recommended the denial of Arneault's license renewal application, yet his license renewal was never actually denied and was in fact granted.  Arneault complains that, due to Creany's adverse Recommendation, he "has not been sought out … to participate in gaming-related opportunities in Ohio and other venues" (AC ¶ 251), yet this hardly constitutes an inability on Arneault's part to pursue his chosen occupation.

Defendants further point out that, even if the Board had denied Arneault's license, this action would only have deprived Arneault of his ability to act as a "principal" of a gaming company licensed to operate slot machines in Pennsylvania.  We agree with Defendants that this defines Arneault's "chosen profession" too narrowly.  See *Langweiler v. Borough of Newtown*, Civil Action No. 10-3210, 2010 WL 5393529 at *5 (E.D. Pa. Dec. 29, 2010) (stock broker who lost licenses in two states did not state a claim for deprivation of his right to pursue his occupation because he did not allege that he could not obtain a license from another state).  Because Arneault has failed to allege

facts showing that he has been prevented from pursuing his chosen occupation, his substantive due process claim fails.

Arneault's substantive due process claim suffers from another deficiency, however. Where an aggrieved individual is lodging a substantive due process challenge to the actions of an executive officer, the "threshold question is whether the behavior of [that] officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Burns*, 776 F. Supp. 2d at 92-93 (quoting *County of Sacramento v. Lewis,* 523 U.S. 833, 847 n. 8 (1998)). In a context where the state official enjoys the luxury of time to make "unhurried judgments," the challenged conduct may be sufficiently conscience-shocking if it displays deliberate indifference to the aggrieved individual's welfare. *Id. (citing Lewis,* 523 U.S. at 853).

Yet, as the *Burns* court noted, the holding of *Lewis* suggests "that the substantive due process inquiry must account not only for the amount of time that a state official has to act, but also for the precise nature of the 'harm' visited upon the aggrieved individual as a result of that official's conduct." 776 F. Supp. 2d at 94. In the context of *Burns,* that meant considering not only the harm suffered by the plaintiff as a result of being designated an "indicated" child abuser, but also the state's interest in ensuring that children are protected from actual abusers. *Id*. As the court explained, "when the 'harm' intentionally caused by a governmental action is purely incidental to an exercise of the State's police power, the challenged action can be characterized as 'arbitrary' only if it is not rationally related to a legitimate state interest." *Id*. at 95 (citation omitted). Applying this standard, the *Burns* court found that the existence of "some evidence" to support the child welfare official's finding of "indicated" abuse "suggested that his

63

actions were motivated by a genuine desire to ensure that children were not being mistreated." *Id*. (citation omitted). Therefore, since the defendant's actions were rationally related to a legitimate governmental interest, "they were not arbitrary in the constitutional sense." *Id*. (citation omitted).

In the context of this case, Arneault's allegations establish that Brletic and Creany acted on the basis of "some evidence" to support the adverse Recommendation, albeit evidence which Arneault claims was untrustworthy. We are not privy to the unredacted Recommendation of Denial, and therefore we do not know what all of the areas of purported concern were relative to Arneault or whether they all derived from the allegedly unreliable information obtained from Charles Sack. However, it is clear from the Amended Complaint that Brletic and Creany are accused of actions they took while ostensibly carrying out certain statutorily-mandated duties intrinsic to the legislative purposes behind the Gaming Act. Arneault seeks to make out a substantive due process claim by alleging that these state actors knowingly relied on tainted information for malicious purposes unrelated to their legitimate governmental responsibilities. However, "merely alleging an improper motive is insufficient" to establish conscience-shocking behavior, "even where the [alleged] motive is unrelated to the merits of the underlying decision." *Chainey Street,* 523 F.3d 200, 220 (3d Cir. 2008) (addressing substantive due process claim in the zoning context and noting that application of the conscience-shocking standard "prevents us from being cast in the role of a 'zoning board of appeals.'") (citation omitted). *See also Burns,* 776 F. Supp. 2d at 95 (plaintiff failed to allege a substantive due process violation, despite claiming that defendant acted with "gross negligence").

For the foregoing reasons, we conclude that Arneault has failed to allege a viable substantive due process claim. Accordingly, Count 3 of the Amended Complaint will be dismissed.

### 4. Alleged Violations of Rubino's Due Process Rights

In Count 4 of the Amended Complaint, Rubino claims that Defendants O'Toole and Sherman, together with the BIE Defendants and the Commissioner Defendants, violated his due process rights. Specfically, Rubino contends that the Defendants deprived him of constitutionally protected property and liberty interests in (i) a stigma-free reputation, (ii) his real estate license, and (iii) his right to freely pursue his calling without undue governmental interference. The alleged infringement of these asserted interests forms the basis of both Rubino's procedural due process claim as well as his substantive due process claim.

With respect to his "stigma-plus" theory, Rubino contends that the "stigma" requirement is met because the inclusion of SOC 58 in PIDI's license clearly implied the existence of unsavory facts about him and his unfitness to be involved in the gaming industry. Rubino claims that SOC 58 is a matter of public record and has been widely reported on by the media, resulting in damage to his reputation. With respect to the "plus" requirement, Rubino claims that he has been subjected to a de facto ban on his ability to work in the gaming industry anywhere as a result of SOC 58 and has experienced material interference with his real estate practice because he was unable to represent prospective buyers of MTR/PIDI properties, which caused him to lose out on potential sales commissions.

Somewhat relatedly, Rubino claims that the Defendants' conduct restricted his real estate license and infringed upon his right to follow his profession without unreasonable governmental interference. He cites *Pro's Sports Bar & Grill, Inc. v. City of Country Club Hills*, 589 F.3d 865 (7th Cir. 2009) and *National Broadcasting Co., Inc. v. Federal Communications Commission*, 132 F.2d 545 (D. C. Cir. 1942), *aff'd* 319 U.S. 239 (1943), for the proposition that, when a person is issued a license by a government entity pursuant to statute and the government subsequently imposes additional restrictions on the license, the government has infringed upon the person's federally protected liberty and property rights – even where the infringement is slight or merely the collateral effect of other governmental action. Rubino complains that the inclusion of SOC 58 as a condition to PIDI's slot machine operator's license and the PGCB's interpretation of this condition to mean that Rubino could not represent a third party seeking to purchase real estate from PIDI represented a restriction on his real estate license that implicated the demands of due process.

Although the BIE Defendants and Commissioner Defendants have challenged Count 4 on numerous grounds, we conclude that Rubino's due process claims cannot proceed beyond the Rule 12(b)(6) stage because they are facially untimely. As we previously discussed with respect to Count 2, the two-year statute of limitations applicable to §1983 actions bars any claim in this case which accrued prior to April 15, 2009. The Amended Complaint makes clear that SOC 58 became a condition of PIDI's license on August 20, 2007, and Rubino was certainly aware of this condition and its negative consequences for him personally, as he filed a petition challenging SOC 58 on February 13, 2008. Thus, to the extent Rubino is claiming an entitlement to pre-

deprivation process, he clearly was or should have been aware of the alleged

constitutional deprivation by the time he filed his February 2008 petition.

Rubino did eventually receive an administrative hearing on his petition on

November 25, 2008, but he claims this post-deprivation hearing was defective as a

matter of law.  Specifically, he argues that this hearing came too late, having occurred

more than one year after SOC 58 was imposed and only after he had already suffered

substantial harm.  Thus, Rubino's claim is also untimely to the extent it is based on a

lack of adequate post-deprivation process.   Based on his own averments and his own

interpretation of his due process theory, Rubino was clearly aware, or should have been

aware, of the alleged inadequacy of his post-deprivation administrative hearing no later

than November 25, 2008.  Again, because these alleged deprivations occurred prior to

April 15, 2009, Rubino's due process claims are untimely.

Moreover, the events surrounding Rubino's petition for relief from SOC 58 do not

form the basis of a continuing due process violation.  As our circuit court of appeals has

explained, "'[t]he focus of the continuing violations doctrine is on affirmative acts of the

defendants'" and "'a continuing violation is occasioned by continual unlawful acts, not

continual ill effects from the original violation.'"  *Weis–Buy Serv., Inc. v. Paglia*, 411 F.3d

415, 422–23 (3d Cir.2005) (quoting Cowell v. Palmer Twp., 263 F.3d 286, 293 (3d

Cir.2001)).  *See also Mumma v. High-Spec, Inc.*, 400 Fed. Appx. 629, 632 (3d Cir.

2010).  Moreover, the doctrine does not apply when a plaintiff "is aware of the injury at

the time it occurred."  *Morganroth v. Norris, McLaughlin & Marcus*, P.C., 331 F.3d 406,

417 n. 6 (3d Cir.2003).  To the extent Rubino is complaining of the Commissioner

Defendants' failure to "undo" the damage allegedly caused by SOC 58 by virtue of its

failure to render appropriate process after November 25, 2008, this is not a fresh constitutional violation but merely a continuation of the "ill effects" of the original deprivation. *See Schneck v. Saucon Valley School Dist*., 340 F. Supp. 2d 558, 570 (E.D. Pa. 2004) (A defendant's "refusal to undo a discriminatory decision is not a fresh act of discrimination. If it were, then [a plaintiff] could avoid the (limitations period) by filing a series of appeals or fresh requests.") (public employment discrimination case)(*quoting Lever v. Northwestern Univ*., 979 F.2d 552, 556 (7th Cir.1992)(second alteration in the original).

In any event, for the reasons previously discussed, the Commissioner Defendants' actions in relation to the adjudication of Rubino's SOC 58 petition on September 2, 2009 are subject to absolute quasi-judicial immunity. Accordingly, that ruling cannot form the basis of a viable due process claim. Because Rubino has not alleged any facts which can overcome this deficiency, Count 4 will be dismissed.[14]

### 5.  Claims Premised Upon Policy-Making Liability

In Count 6 of the Amended Complaint, Plaintiffs assert a cause of action against the Commissioner Defendants premised upon their alleged failure to ensure that all investigations and administrative procedures were conducted in a fair, impartial, and unbiased manner and that all attorneys, administrative staff, and investigators were properly trained, monitored, evaluated and supervised with respect to investigations and

---

[14] Independently of the Court's statute of limitations analysis, Count 4 fails to state a claim against Defendants Sherman and O'Toole because none of the averments in the Amended Complaint implicate those Defendants in the imposition of SOC 58 and the alleged deficiencies in the November 25, 2008 administrative hearing. Similarly, none of the BIE Defendants were personally involved in the imposition of SOC 58, nor did they control the process available to Rubino in connection with SOC 58. Therefore, Count 4 fails to state a viable cause of action against those Defendants as well.

related procedures.  (See AC ¶ 415.)  Plaintiffs argue that the Commissioner Defendants acted with deliberate indifference "in their failure to properly train and supervise PGCB employees" and in "their failure to establish proper policies and procedures to prevent the sort of disregard of constitutional rights that Mr. Arneault and Mr. Rubino experienced at the hands of the PGCB."  (Pls.' Br. in Opp. [73] at p. 88.)

Based on the caption of Count 6, and the averments therein, it appears that Plaintiffs are asserting due process violations against the Commissioner Defendants in their capacities as purported policy-makers.  "[A] supervisor may be liable under § 1983 if he or she implements a policy or practice that creates an unreasonable risk of a constitutional violation on the part of the subordinate and the supervisor's failure to change the policy or employ corrective practices is a cause of this unconstitutional conduct."  *Argueta v. U.S. Immigration and Customs Enforcement,* 643 F.3d 60, 72 (*citing Brown v. Muhlenberg Township*, 269 F.3d 205, 216 (3d Cir.2001)).

However, to the extent Plaintiffs are seeking to hold the Commissioner Defendants liable relative to the alleged wrongdoing of the BIE Defendants, Plaintiffs' claim fails because the Commissioner Defendants lack any direct oversight over the BIE and/or the OEC.  As a matter of statutory law, the BIE and OEC, while departments within the PGCB, are deemed to be "independent of the board" in matters relating to gaming enforcement.  4 Pa. C.S.A. § 1517(a).  Neither the Board, nor its Executive Director, nor its Chief Counsel have the power to direct or control the BIE in terms of their investigations of applicants, licensees, or registrants, *see id*. at §§1202.1(c.1), 1516.1 and 1517(a.1), nor does the Board exercise control over the OEC with respect to the OEC's decisions to file recommendations or objections concerning the issuance of

licenses, permits and registrations. *See id*. at § 1517(a.2). Thus, the Commissioner Defendants are not "policymakers" who can be held liable for the alleged wrongful acts of the BIE Defendants in this case.

Plaintiffs suggest in their brief that the Commissioner Defendants were directly involved – and therefore acted as policymakers -- in the alleged deprivation of Rubino's due process rights insofar as they held his SOC 58 petition in abeyance. For the reasons previously discussed, however, we have already concluded that the Board's September 2, 2009 adjudication is subject to absolute quasi-judicial immunity and did not constitute any "continuing violation" (nor an independent violation) of Rubino's due process rights. It would make no sense to deprive the Commissioner Defendants of quasi-judicial immunity based on their September 2, 2009 adjudication merely because Plaintiffs in Count 6 are purporting to sue these Defendants as administrative "policy-makers" relative to their own ruling.

Moreover, liability on the part of an alleged policy-maker can exist only where an actionable predicate constitutional violation is established as a result of the policy. *See Grazier ex rel. White v. City of Philadelphia,* 328 F.3d 120, 124 (3d Cir. 2003). Because neither Arneault nor Rubino have pled an actionable due process violation, however, there can be no viable claim for policy-making liability as against the Commissioner Defendants.

Plaintiffs also suggest in their brief that the Commissioner Defendants should be liable as policymakers because of the fact that a hearing officer allegedly placed content-specific restrictions on the Plaintiffs' speech during a May 3, 2011 hearing concerning PIDI's license renewal application. According to Plaintiffs, the

Commissioner Defendants "sat idly by while the presiding Hearing Officer, a PGCB employee, refused to allow Mr. Arneault or Mr. Rubino to express their concerns regarding the renewal of PIDI's license during the non-adversarial 'public input' portion of the meeting."  (Pls.' Br. in Opp. [73] at p. 88 (citing AC ¶¶ 300-21.)  This theory, too, is insufficient to state a viable §1983 claim against the Commissioner Defendants.

First, Plaintiffs have failed to plead a First Amendment violation based on the events of May 3, 2011.  Second, the complained of conduct, even if it stated a viable claim, would implicate only the hearing officer, who is not a named Defendant in this case.  Third, the Amended Complaint expressly acknowledges that the PGCB has adopted a "Code of Conduct for Public Comment," which would have protected the Plaintiffs' right to speak freely at the May 3, 2011 hearing, had the hearing officer merely abided by it.  (AC ¶¶ 320-21.)  This allegation thus belies any claim that the Commissioner Defendants had established a policy or custom of suppressing speech which could have served as the "moving force" behind the hearing officer's alleged misconduct.

In sum, Plaintiffs have failed to allege any basis for imposing supervisory liability on the Commissioner Defendants.  Accordingly, Count 6 will be dismissed.


### 6. Claims Based Upon Alleged Conspiracy

In Counts 7 and 10 of the Amended Complaint, Plaintiffs have asserted § 1983 claims against the MTR Defendants, Griffin, Hughes, Ambrose, and the Scott Defendants based upon the theory that these Defendants conspired with the

71

Government Defendants to violate Plaintiffs' First and Fourteenth Amendment rights.

To make out a conspiracy claim under § 1983, a plaintiff must show that "persons acting under color of state law conspired to deprive him of a federally protected right." *Ridgewood Bd. of Educ. v. N.E. ex rel. M.E.*, 172 F.3d 238, 254 (3d Cir.1999). Private actors, such as the non-governmental Defendants named here, can be viewed as acting "under color of state law" only if their conduct is fairly attributable to the state. *See Rendell-Baker v. Kohn*, 457 U.S. 830, 838 (1982).

However, a § 1983 conspiracy claim only arises when there has been an actual deprivation of a federal right. *Perano v. Township of Tilden*, 423 Fed. Appx. 234, 239 (3d Cir. Apr.13, 2011) (citing *Andree v. Ashland County*, 818 F.2d 1306, 1311 (7th Cir.1987) and *Dixon v. City of Lawton*, 898 F.2d 1443, 1449 (10th Cir.1990) (recognizing that deprivation of a right was a necessary predicate to § 1983 conspiracy liability)). *See also Hurst v. State Farm Mutual Auto. Ins. Co.,* Civ. Action No. 10–1001–GMS, 2012 WL 426018 at *13 (D. Del. Feb. 9, 2012). Because neither Arneault nor Rubino has successfully pled an actionable constitutional deprivation, neither one can plead a viable conspiracy claim under §1983.

In Count 7, the Plaintiffs assert that the MTR Defendants (along with Griffin and Hughes) violated their federal rights by essentially stonewalling Arneault's request for documents concerning Tecnica's and Rubino's handling of the Green Shingle and other PIDI properties, which Arneault sought for the purpose of challenging the OEC's January 22, 2010 Recommendation of Denial and the allegedly false allegations concerning Arneault's prior relationship with Charles Sack. Although Rubino is named as a Plaintiff in Count 7, the Amended Complaint fails to state any coherent theory as to

how MTR could have conspired with the Government Defendants to violate Rubino's rights. Virtually all of the Governmental conduct about which Rubino complains, and which forms the basis of his First and Fourteenth Amendment claims, predated Creany's January 22, 2010 Recommendation of Denial and thus occurred *prior to* the alleged misconduct by the MTR Defendants.[15] Moreover, the Amended Complaint establishes that the Plaintiffs are essentially blaming the MTR Defendants for not producing documents *which Rubino and Tecnica contemporaneously possessed* – documents (it is alleged) which supposedly would have allowed Rubino to successfully challenge SOC 58.

Arneault's conspiracy claims against the MTR Defendants fares no better. For the reasons previously discussed, we have found that Arneault was afforded all of the process to which he was constitutionally entitled. We have also found that the allegations in the Amended Complaint are insufficient to state a substantive due process deprivation. Accordingly, Arneault cannot state a viable §1983 conspiracy claim against MTR.

In Count 10 of the Amended Complaint, Plaintiffs assert that Ambrose, acting as the agent of the Scott Defendants, conspired with the Government Defendants to deny the Plaintiffs their First and Fourteenth Amendment rights. More specifically, Count 10 asserts that Ambrose provided false and derogatory information, as well as illegally-obtained proprietary information, "to one or more of the Government Defendants with

---

[15] Only two acts of alleged retaliation post-date Creany's January 22, 2010 Recommendation of Denial – the refusal by Defendants Sherman and Creany to respond to Rubino's counsel at some unspecified point in 2010 and Chief Enforcement Counsel Pitre's failure after May 2010 to recommend the termination of SOC 58. We have already determined that these alleged acts fail to state any viable basis for a First Amendment retaliation claim against the named Defendants.

the intention that they would rely on that information when addressing Mr. Arneault's license renewal application and Mr. Rubino's repeated requests to have SOC 58 removed."  (AC ¶ 454.)

Here again, these allegations do not amount to an actionable theory of conspiracy on the part of Ambrose, much less the Scott Defendants.[16]  According to the Amended Complaint, Ambrose is alleged to have provided false and derogatory information to Brletic and Tallent in July or August of 2006.  (AC ¶ 118.)  He is also alleged to have provided the Government with proprietary information that had been stolen from Tecnica and Rubino. This latter disclosure is alleged to have occurred at some point after July 7, 2007 but before mid-November 2008.  (AC ¶¶117 and n. 18.)

Assuming these facts to be true, it is clear that Ambrose did not commit any overt acts in furtherance of the alleged conspiracy within the applicable two-year limitations period.  *See Wilson v. King,* Civil Action No. 06-CV-2608, 2010WL1071651 at *4 (E.D. Pa. Mar. 22, 2010) (two-year statute of limitations applies to conspiracy claims brought under §1983).  In this circuit, the statute of limitations on a §1983 conspiracy claim begins to run from the commission of each overt act causing injury:

> *For each act causing injury, a claimant must seek redress within the prescribed limitations period.  Such a rule is consistent with the distinction between civil and criminal conspiracies.  In the civil case, actual injury is the focal point, not the illegal agreement per se, as is true in the criminal context.*
>
> Adoption of the last over act rule … would invite attempts to revive time-barred injuries by piggy-backing them onto actions occurring within the relevant period.  No unfairness results in requiring diligence in seeking a remedy within the period measured from the date an injury occurs.

---

[16] Plaintiffs' only allegation against the Scott Defendants is their conclusory averment that, at all times, Ambrose was engaging in his alleged misconduct as the agent of the Scott Defendants.  (AC ¶ 452.)  We find this averment insufficient under the pleading standards set forth in *Twombly* and *Iqbal.*, *supra.*

*Kost v. Kozakiewicz*, 1 F.3d 176, 191 (3d Cir. 1993) (quoting *Wells v. Rockefeller,* 728 F.2d 209, 217 (3d Cir. 1984) (emphasis in the original) (ellipsis added). Because Ambrose's last alleged act in furtherance of the conspiracy occurred no later than mid-November, 2008, Rubino's §1983 conspiracy claim against Ambrose is untimely.

Although Rubino has alleged that he did not discover Ambrose's conspiratorial conduct until Brletic's deposition was taken on August 10, 2010, this is of no avail to Rubino. Clearly, the underlying constitutional injury of which Rubino complains is the alleged lack of due process he suffered in conjunction with the imposition of SOC 58. As we have previously explained, Rubino's own averments establish that this alleged violation was complete as early as August 20, 2007 (when SOC 58 was imposed without pre-deprivation process) and no later than November 25, 2008 (the date on which Rubino received his allegedly deficient post-deprivation administrative hearing). To the extent Ambrose's actions contributed to this injury, the statute of limitations nevertheless accrued no later than November 25, 2008 and expired in November of 2010, well before the commencement of this civil action. The fact that Rubino did not uncover Ambrose's alleged role in the asserted due process violation is of no legal moment: "[i]n general, the rule that a cause of action accrues upon discovery of the injury does not require that a plaintiff have identified every party who may be liable on its claim." *Graff v. Kohlman,* 28 Fed. Appx. 151, 154 (3d Cir. 2002) (citing *New Castle County v. Halliburton NUS Corp.,* 111 F.3d 1116, 1125 (3d Cir. 1997) (rejecting plaintiff's theory that his complaint was timely because he did not discover the involvement of certain defendants until well after the initial disputes over his property tax

assessment which formed the subject matter of his complaint; subsequent alleged wrongdoing on the part of the defendants did not establish a "continuing conspiracy"). Rubino has alleged no actionable constitutional deprivation post-dating his November 25, 2008 administrative hearing and, consequently, his conspiracy claims in Count 10 fail as a matter of law.

Arneault similarly fails to state a viable § 1983 conspiracy claim against Ambrose and/or the Scott Defendants. Because he has not met the threshold requirement of pleading a viable constitutional deprivation, his conspiracy claim in Count 10 is likewise untenable. Inasmuch as Counts 7 and 10 fail to state a §1983 claim upon which relief can be granted, they will be dismissed.

### 7. Amendment

For the reasons previously discussed, we find that Counts 1, 2, 3, 4, 6, 7 and 10 fail to state a viable claim for relief under § 1983. "[A] district court has discretion to deny a request to amend if it is apparent from the record that ... the amendment would be futile[.]" *Hill v. City of Scranton*, 411 F.3d 118, 134 (3d Cir.2005).

Here, the record before us includes Plaintiffs' original and amended complaints, the parties' supplemental exhibits, Plaintiffs' response to the various motions to dismiss, and their arguments offered at the hearing which was held before this Court on November 21, 2011. Accordingly, we are well-acquainted with the Plaintiffs' legal theories and factual averments concerning the Defendants' alleged misconduct. Moreover, we have afforded Plaintiffs ample opportunity to supplement or clarify their allegations and legal theories. In our view, Plaintiffs have already presented their

76

strongest possible allegations and, despite this, we find that the claims suffer from deficiencies that are not amenable to being cured upon further pleading. Accordingly, we find that leave for further amendment is unwarranted, and we will dismiss Plaintiffs' federal claims with prejudice.

### B. Plaintiff's State Law Claims

Plaintiffs have also asserted state law claims against the non-Government Defendants for unjust enrichment, slander, and defamation. Because the parties lack complete diversity of citizenship for purposes of 28 U.S.C. § 1332, the Court's sole basis of jurisdiction over these claim is 28 U.S.C. § 1367, which provides that "the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). A district court may decline to exercise supplemental jurisdiction over a claim if "the district court has dismissed all claims over which it has original jurisdiction." Id. at § 1367(c)(3). *See Elkadrawy v. Vanguard Group, Inc.*, 584 F.3d 169, 174 (3d Cir. 2009) (once the District Court dismissed the plaintiff's federal claims, leaving only the state claim, the prerequisites for § 1367(c)(3) were met). Accordingly, this Court declines to exercise supplemental jurisdiction over the remaining state law claims and those causes of action will be dismissed without prejudice.

### IV. CONCLUSION

Based upon the foregoing reasons, the Defendants' motions to dismiss will be granted insofar as they relate to Plaintiffs' federal claims in Counts 1, 2, 3, 4, 6, 7, and

10 of the Amended Complaint.  Pursuant to our prior discussion, those claims shall be dismissed with prejudice.  Inasmuch as this Court declines to exercise supplemental jurisdiction over Plaintiffs' remaining state law claims, those claims shall be dismissed without prejudice to Plaintiffs' right to reassert them in state court.

An appropriate order follows.

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

EDSON R. ARNEAULT, *et al.,*          )
                                      )
                 Plaintiffs,          )          Case No.  1:11-cv-95-SJM
        v.                            )
                                      )
KEVIN T. O'TOOLE, *et al.,*           )
                                      )
                 Defendants.          )


**O R D E R**

AND NOW, *to wit,* this 28th Day of March, 2012, for the reasons set forth in the

accompanying Memorandum Opinion,

IT IS ORDERED that the motions to dismiss the Amended Complaint filed on

behalf of Defendant Hughes [36], the Commissioner Defendants and the PGCB

Employee Defendants [58], Defendant Griffin [64], and the BIE Defendants [66] shall be,

and hereby are, GRANTED.

IT IS FURTHER ORDERED that the motions to dismiss the Amended Complaint

filed on behalf of Defendant Ambrose [51], the Scott Defendants [60], and the MTR

Defendants [62] shall be, and hereby are, GRANTED to the extent they relate to

Plaintiffs' federal claims.  Said motions shall be, and hereby are, DENIED without

prejudice insofar as they relate to Plaintiffs' state law claims.

In accordance with the foregoing, IT IS ORDERED that Counts 1, 2, 3, 4, 6, 7,

and 10 of the Amended Complaint shall be, and hereby are, DISMISSED with prejudice.

IT IS FURTHER ORDERED that Plaintiffs' remaining state law claims as set forth in

Counts 8, 9, and 11 of the Amended Complaint shall be, and hereby are, DISMISSED without prejudice to Plaintiffs' right to reassert these claims in state court.


                                              s/     Sean J. McLaughlin

                                                     SEAN J. McLAUGHLIN
                                                     United States District Judge


cm:    All counsel of record.